Michael Youssef

ID No. 399432022

10 Anderson Court, East Brunswick NJ 08816

(202) 855-4054

*Attorney for* Hani Hanna, M.D.


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

NEWARK VICINAGE


-------------------------------------------------------x

**HANI HANNA, M.D.,**



**Plaintiff,**                                   **DOCKET NO. _____**

**v.**

**HACKENSACK MERIDIAN HEALTH,**        **CIVIL ACTION**

**ENVISION HEALTHCARE d/b/a**
**ENVISION PHYSICIAN SERVICES,**

**HANS SCHMIDT, M.D., and**

**MARK SCHLESINGER, M.D.,**

**COMPLAINT AND JURY DEMAND**

**Defendants.**

--------------------------------------------------------x

Plaintiff Hani Hanna, M.D. ("Plaintiff" or "Dr. Hanna") by his attorney files this Complaint against Defendants Hackensack Meridian Health ("HMH"), Envision Healthcare d/b/a Envision Physician Services, Hans Schmidt, M.D., and Mark Schlesinger, M.D., ("Defendants") and hereby states the following antitrust, fraud, trade libel, breach of contract, and due process denial claims as follows:

JURISDICTION AND VENUE:

1. This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.

2. This Court also has matter jurisdiction over the state law claims, which are substantially related to the federal claims, under 28 U.S.C. § 1367.

3. This Court has personal jurisdiction over this case. Specific jurisdiction exists because the hospital which the Defendants operate and employed Dr. Hanna in are in New Jersey, and General jurisdiction exists because Defendants Schlesinger and Schmidt reside in New Jersey, and both Envision Health and Hackensack Meridian Health conduct business in New Jersey.

4. Venue is proper in this district under Section 1391 of Title 28, 28 U.S.C. § 1391, and under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, in that Defendant HMH and Defendant Envision Healthcare are corporations that reside within this judicial district, are inhabitants of this judicial district, and may be found within this judicial district. Venue also is proper in this district under Section 1391 because all of the events giving rise to these claims occurred within this judicial district, and a substantial portion of the affected trade or commerce discussed herein has been carried out within this judicial district.

I. PARTIES

5. Plaintiff Dr. Hani Hanna ("Dr. Hanna") is an anesthesiologist residing at 185 Prospect Avenue, 12R, Hackensack, NJ 07601 who provided anesthesia services to Hackensack

Meridian Health through his employment with Envision Healthcare. Dr. Hanna is a skilled anesthesiologist, and specifically a pediatric anesthesiologist. Pediatric anesthesiologists must demonstrate an immense amount of skill in their craft in order to ensure they provide the proper dosage for their smaller, more fragile patients. Throughout Dr. Hanna's 15+ year career, he has never been responsible for any patient issues or malpractice.

6. Defendant Hackensack Meridian Health ("HMH") is a network of hospitals and healthcare service providers that provides services across the state of New Jersey, including the Hackensack University Medical Center ("HUMC") hospital at 30 Prospect Avenue, Hackensack, New Jersey 07601.

7. Defendant Envision Healthcare is an organization which employs various specialized doctors, such as anesthesiologists, including Dr. Hanna, and contracts them to work at hospitals such as HUMC. Envision Healthcare is headquartered at 20 Burton Hills Blvd, Suite 500 Nashville, TN 37215, and operates a corporate office at 3 Century Drive Parsippany, NJ 07054.

8. Defendant Hans Schmidt is the President of Medical and Dental Staff at Hackensack University Medical Center and is the President of New Jersey Healthcare Services at Envision Healthcare.

9. Defendant Mark Schlesinger is the Chair of the Department of Anesthesia at Hackensack Meridian Health and the Vice President of New Jersey Healthcare Services at Envision Healthcare.

## II. FACTS

10. This case concerns the events following Dr. Hanna's resignation from HUMC, and its affiliates. In retaliation for Dr. Hanna's resignation, Defendants Mark Schlesinger and Hans Schmidt, on behalf of Defendants HMH and Envision Healthcare, fabricated evidence and furnished false statements to intentionally deceive the National Practitioner Data Bank ("NPDB") and the Secretary of Health and Human Services representative ("Secretary"), effectively preventing Dr. Hanna from procuring employment for the following two and a half years.

11. On May 5, 2022, at 12:08 PM, after ensuring proper coverage for his duties for that day, Dr. Hanna responsibly resigned from his position at HUMC via email to Defendant Mark Schlesinger (Exhibit A). Defendant Schlesinger confirmed Dr. Hanna's resignation via a cellphone call at 5:44pm the same day.

12. On May 6, 2022, Defendant Schlesinger issued Dr. Hanna a suspension and claimed to have initiated an investigation, via a letter attached as Exhibit B ("Backdated Letter"). The

backdated letter bore the date of May 5 and was phrased to appear to have been written the day before it was sent. The entirety of Defendants' investigation into Dr. Hanna began and ended with the Backdated Letter.

13. On May 6, 2022, Schlesinger wrote to inform Schmidt of Dr. Hanna's resignation the day prior, stating that Dr. Hanna resigned on May 5 and that pursuant to Dr. Hanna's employment agreement, he "waived any right… to a hearing or due process". This letter is attached as Exhibit C ("Investigation Termination Letter").

14. Defendant Schmidt responded to the Exhibit C letter agreeing that Dr. Hanna waived "any rights to a hearing or due process" due to his resignation. Schmidt's response letter is attached as Exhibit D ("Acknowledgement of Investigation Termination").

15. In the letters of Exhibits C and D, Defendants Schmidt and Schlesinger admit that Dr. Hanna resigned on May 5 and state he waived "any rights to a hearing or due process" as a result of his resignation.

16. After his retroactive suspension and during the so-called "investigation", Dr. Hanna was not afforded "any rights to a hearing or due process". Defendants refer to Dr. Hanna's resignation as the reason which the "investigation" ended, even though Dr. Hanna resigned a day _before_ the investigation started and before any suspension was contemplated or issued.

17. By Defendants' own admission, the investigation into Dr. Hanna began on May 6, 2022, when Schlesinger sent the Backdated Letter, and ended on May 5, 2022, when Dr. Hanna resigned. In fact, Defendants' own counsel, Giblin & Combs LLC, admits that Dr. Hanna resigned _before_ any decision was made to suspend or investigate Dr. Hanna (see, Exhibit J).

18. Thus, Defendants issued the suspension _after_ Dr. Hanna resigned with the intent to immediately halt their "investigation" as soon as it began. By strategically and maliciously initiating an investigation after Dr. Hanna resigned, Defendants ensured that their false claims could not be rebutted or questioned because their bylaws allowed them to immediately end the investigation due to Dr. Hanna's resignation.

19. Dr. Hanna was not afforded any opportunity to be heard whatsoever. In the Backdated Letter of Exhibit B, Schlesinger states that Dr. Hanna was not entitled to counsel and was only allowed a single hearing. However, in a subsequent letter sent the same day (Exhibit C), Defendant Schlesinger stated that the investigation ended, and that Dr. Hanna waived "any rights to a hearing or due process" as a result of his resignation (which occurred a full day before the investigation began) and thus lost the right to even a single hearing.

20. On the basis of Dr. Hanna's resignation, Defendants Schlesinger and Schmidt denied Dr. Hanna the opportunity for even a single hearing or the chance to submit any evidence.

21. Based on the non-existent "investigation" which began on May 6, when the suspension letter was issued, and ended on May 5, when Dr. Hanna resigned, Defendants submitted a Clinical Privileges Action report (Exhibit E) falsely alleging that (1) Dr. Hanna failed to respond to cellphone calls in the post-operative setting, and (2) Dr. Hanna resigned after learning of an investigation into his purported failure to respond to cell phone calls.

22. Defendants never investigated whether there ever was a failure to respond to cellphone calls.

23. Dr. Hanna's cell phone records, attached as Exhibit G, conclusively show that no attempt was made to reach Dr. Hanna via cellphone.

24. Defendants did not attempt to verify their claims by checking their own call logs. They instead actively denied Dr. Hanna the opportunity to submit his own call logs during their "investigation", which began and ended one day after Dr. Hanna resigned.

25. On June 16, 2022, 41 days after the investigation that began and ended on May 6, Defendants submitted the Clinical Privileges Action report (Exhibit E), falsely stating that they suspended and investigated Dr. Hanna, and that he resigned while under or to avoid the investigation. The report was filed without ever even looking to see if they did attempt to reach Dr. Hanna, and after knowingly and intentionally not having attempted to reach Dr. Hanna via cell phone or overhead pager a single time. Dr. Hanna was readily available at the hospital the entire day until he found coverage for his duties that day and resigned.

26. The Clinical Privileges Action report attached as Exhibit E has been the stated reason why multiple hospitals have rejected Dr. Hanna's applications for employment.

27. Dr. Hanna was unsuccessful in his appeal of the Clinical Privileges Action report because the Defendants submitted the fabricated evidence, including the Backdated Letter, to the Secretary ("Defendants' Response to the NPDB Appeal", Exhibit F).

28. Defendants sent the Backdated Letter of Exhibit B, as well as the letters of Exhibits C and D, in their Response to the NPDB Appeal (see, Exhibit F).

29. In their Response to the NPDB Appeal, Defendants admit that the investigation ended "in light of Dr. Hanna's resignation", and then refer to the Backdated Latter of Exhibit B as evidence of the start of the investigation. Thus, by Defendants' own admitted timeline, the investigation began when they sent the Backdated Letter, on May 6, and ended when Dr. Hanna resigned, on May 5.

30. In their Response to the NPDB Appeal, Defendants clarify that the entire basis for the "suspension and investigation" concerned an alleged "failure to respond to calls in the post-operative setting" allegedly made via "cell phone and overhead paging system" (Exhibit F). Dr. Hanna's Cellphone Record (Exhibit G) definitively proves that Defendants' statement to the NPDB is false.

31. The NPDB relied on the date on the Backdated Letter in denying Dr. Hanna's appeal. The Secretary's Final Decision, attached as Exhibit I, refers to the Backdated Letter as evidence of the possibility of an investigation and thus denied Dr. Hanna's appeal of the report.

32. In reviewing the Defendants' Response, the Secretary assumes that the facts supplied by the reporter are true and makes judgments based on this presumption, without verifying the merits or veracity of the reported information. (See NPDB Guideline F-5, which states that: "The Dispute Resolution process does not include reviewing: [1] The underlying reasons for the report… or [2] The extent to which entities followed due process procedures".)

33. Defendants intentionally took advantage of the NPDB's Dispute Resolution process by falsifying the underlying reasons for the report and then intentionally denying Dr. Hanna the right to dispute it in any way before making the NPDB report.

34. The Healthcare Quality Improvement Act ("HCQIA") includes an exception to the blanket immunity normally afforded to healthcare providers when filing Clinical Privileges Action reports: Reporters who knowingly furnish false information to the NPDB and the Secretary in review of a report are not afforded immunity.

**Defendants knew that the two allegations they reported in the Clinical Privileges Action report were false.**

35. The Clinical Privileges Action report filed against Dr. Hanna is limited to precisely two accusations: (1) "patient care concerns" which Defendants conceded were due to "failure to respond to calls in the post-operative setting… made via cell phone and on the overhead paging system" (see, Exhibit F); and (2) that Dr. Hanna resigned "while under or to avoid investigation". Defendants had knowledge that both of these accusations were false.

**(1) Defendants knew that no attempt was made to reach Dr. Hanna via cell phone, and actively frustrated any attempt to investigate or validate such claims.**

36. Defendants allege that the "patient care concerns" are due to missed cell phone calls to the post-operative setting, which they claim occurred at some point before Dr. Hanna resigned at 12:08 pm on May 5, 2022.

37. Dr. Hanna received no cell phone calls hailing him to the post-operative setting, despite Defendants explicitly claiming attempts were made to reach him via cell phone. In addition, no attempts were made via the overhead paging system. The only time Dr. Hanna was hailed to the post-operative setting on May 5, 2022, a nurse found Dr. Hanna attending to a different patient and directed him to the other patient's room. No other attempt was made or needed to reach Dr. Hanna on May 5, 2022.

38. Dr. Hanna was denied the opportunity to provide even the most basic evidence, such as his cell phone records from his provider, that would immediately exonerate him from the claim that he missed cellphone calls hailing him to the post-operative setting.

39. Defendants had an opportunity to review their own call logs which also would have revealed that no attempt was made to reach Dr. Hanna that morning. Instead, Defendants immediately halted the investigation right after purportedly initiating it, intentionally frustrating any attempt to expose the truth instead of seriously investigating their claims.

40. Further, Dr. Hanna did not miss any calls via the overhead paging system, since the standard procedure would then have been to call Dr. Hanna on his cell phone if he had missed any calls on the overhead paging system. However, no cell phone calls were placed to Dr. Hanna's phone and no attempt was made to reach him because Dr. Hanna was readily available in the post-operative setting and a nurse was able to immediately reach him.

**(2) Defendants had knowledge that the Backdated Letter bore the incorrect date when Dr. Schlesinger intentionally changed the date and wording of the letter so it would appear to predate Dr. Hanna's resignation, even though it was drafted and sent a full day after.**

41. The Backdated Letter (Exhibit B) contains more than just the incorrect date. In addition to being dated for May 5, 2022, the day Dr. Hanna resigned, despite being drafted, published, and sent on May 6, 2022, Defendant Dr. Mark Schlesinger intentionally worded the Backdated Letter to describe the events of "that day" as if it were sent on May 5, 2022. Dr. Schlesinger knew that the date was incorrect and intentionally fabricated the letter to appear to have been written a full day earlier than it had been.

42. After backdating the letter, Dr. Schlesinger then instructed Barbara Vaitovas, Director of Medical Staff Relations at HMH, to send the Backdated Letter to Dr. Hanna, despite the fact that Dr. Schlesinger and Dr. Hanna regularly communicate via email. There was no legitimate reason why Dr. Schlesinger did not directly email the purported "suspension and investigation" letter directly to Dr. Hanna but for the fact that it was backdated. By having Vaitovas send the letter, Defendant Schlesinger can build plausible deniability as to the actual date when the Backdated Letter was drafted.

43. Defendants then sent the Backdated Letter of Exhibit B to the NPDB (see, Exhibit F, Defendants' Response to the NPDB Appeal, first attachment) as evidence that Dr. Hanna resigned "while under or to avoid investigation".

44. The Secretary relied on the date on the Backdated Letter. When Dr. Schlesinger falsified the date and wording of the Backdated Letter, he did so knowing that it was a false statement that would be relied on and accepted as true by the Secretary and the NPDB, and did so with the intention to deceive the Secretary into believing that their "investigation" predated Dr. Hanna's resignation.

45. These false claims form the cornerstone of the Defendants' malicious actions against Dr. Hanna. The Defendants not only made these fraudulent misrepresentations but continued to defend them, showing a clear pattern of willful deceit.

**Defendants made absolutely no attempt at investigating their claims and instead actively concealed the truth.**

46. The timeline of events claimed by Defendants is as follows: On May 5, 2022, at 12:08PM, Dr. Hanna submits his resignation (Exhibit A). Almost a full day later, on May 6 at 10:07AM, Defendants issue the Backdated Letter (Exhibit B) signed by both Defendants Schlesinger and Schmidt, claiming to suspend Doctor Hanna pending further investigation, without acknowledging that he quit a day ago.

47. Defendants admit that the investigation ended "in light of Dr. Hanna's resignation". See, Exhibit F, where Defendants falsely stated to the Secretary that "in light of Dr. Hanna's resignation of his clinical privileges, HUMC did not conduct a further investigation into the incident that led to the summary suspension".

48. Dr. Hanna's resignation occurred on May 5, at 12:08pm (see, the timestamp on the Exhibit A resignation e-mail). The "investigation" did not begin until May 6, at 10:07AM, when Defendant Schlesinger drafted and sent the Backdated Letter (Exhibit B).

49. This chronology reveals that the Defendants' so-called "investigation" ended before it even began, highlighting the absurdity and malice of their actions.

**Dr. Hanna was completely denied all due process rights including the right to even a single hearing, submit evidence or hire an attorney.**

50. Dr. Hanna was completely denied an opportunity to be heard, submit evidence, or even procure legal counsel.

51. The Backdated Letter (Exhibit B) explicitly forbade Dr. Hanna from obtaining legal counsel.

52. Dr. Hanna is not a native English speaker, and in addition to being denied legal counsel was not given the opportunity to use a translator.

53. Any opportunity for Dr. Hanna to submit his cell phone records would have immediately exonerated him from the only accusation made against him in the 'investigation', but Dr. Hanna wasn't even allowed to submit evidence.

54. Defendants intentional and false misrepresentations on their Clinical Privileges Action report submitted June 16, 2022 (Exhibit E), Response to the NPDB Appeal sent August 15, 2022 (Exhibit F), and Follow-up to the NPDB Appeal sent September 26, 2022 (Exhibit H)

deceived the NPDB into publishing the false statements. The false statements were accessed by multiple prospective employers of Dr. Hanna, foreclosing him from several employment opportunities.

55. If Defendants had not intentionally misrepresented the facts to the NPDB and had the NPDB known the truth regarding the phone calls and investigation, they would not have published the Clinical Privileges Action report, which specifically relies on the false claims that calls made via cell phone were missed and that an investigation began on May 5.

56. The NPDB "does not act as a factfinder deciding whether incidents listed in the report actually occurred or as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur. See [the NPDB] Guidebook, at F-1 (explaining that the "basis for" the adverse action may not be disputed by the physician)." Leal v. Sec'y, 620 F.3d 1280, 1284. Instead, the NPDB relies on the reporting entity to submit true information, with the caveat that reporting entities who submit false information are subject to liability and not granted immunity for their statements.

57. Dr. Hanna has been unable to secure consistent employment for the past two and a half years due to the Defendants' submission of the fraudulent Clinical Privileges Action report.

58. Defendant HMH is the largest hospital system in New Jersey. FTC v. Hackensack Meridian Health, Inc., 30 F.4th 160.

59. Hackensack University Medical Center ("HUMC") is the busiest hospital in New Jersey. FTC v. Hackensack Meridian Health, Inc., 30 F.4th 160, 164-165.

60. The activities of Defendants, as described in this Complaint, substantially affected interstate commerce, and produced a direct, substantial, and reasonably foreseeable effect on interstate commerce. A boycott of a single physician constitutes a conspiracy that can effect interstate commerce. Summit Health v. Pinhas, 500 U.S. 322, 324. The summary suspension was reported nationwide and prevented hospitals across the country from hiring Dr. Hanna.

61. The relevant product market consists of hospital physician services, and specifically the market for anesthesiologists.

62. The relevant geographic market encompasses the State of New Jersey and the United States of America as a whole. The falsified Clinical Privileges Action has prevented hospitals throughout the entire country from hiring Dr. Hanna, including those hospitals within New Jersey, where Defendants are the largest hospital system.

63. To confirm the feasibility of a geographic market, courts often employ the hypothetical monopolist test. A geographic market is properly defined if a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but significant non-transitory increase in price ("SSNIP") on buyers in that market. FTC v. Hackensack

Meridian Health, Inc., 30 F.4th 160, 167 (referencing U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, § 4.1.1, at 8-9 (2010)).

64. Contracts between HMH and facilities it had merged with in the past show Defendant HMH's ability to raise rates. *Id.*, at 175. Defendant HMH's ability and history of actually raising prices at its facilities shows its actual market dominance and monopoly power within the New Jersey geographic market.

65. Defendant HMH has market power in the hospital services market in New Jersey.

66. Defendant HMH is the largest provider of hospital services within New Jersey, having a 30% share of that market, as measured by revenue. Only one other provider in New Jersey has a market share greater than 10%. *See,* Thein, E. (2023, June 9). *Fitch Affirms Hackensack Meridian Health, NJ at "AA-"; Outlook Stable*. Fitch Ratings. https://www.fitchratings.com/research/us-public-finance/fitch-affirms-hackensack-meridian-health-nj-at-aa-outlook-stable-09-06-2023.

67. In 2023, Defendant Hackensack Meridian Health had a revenue of approximately $7.8 billion.

68. Defendant Mark Schlesinger is an anesthesiologist in competition with Dr. Hanna. Schlesinger conspired with Defendants Hans Schmidt, HMH, and Envision to restrain Dr. Hanna from competing as an anesthesiologist.

69. Since May 6, 2022, when the Defendant Schlesinger initiated the backdated suspension and investigation, Defendants have limited Dr. Hanna's ability to compete in the market for hospital physician services, as an anesthesiologist, due to their fraudulent behavior.

70. Defendants' fraudulent suspension and submission of the fraudulent Clinical Privileges Action report improperly has caused and will continue to cause hospitals to refrain from dealing with Dr. Hanna and similarly effected practitioners, and to exclude competitors from competing with Defendants in the relevant market. Defendants, through their exclusionary and fraudulent conduct have substantially foreclosed Dr. Hanna, and, based on information and belief, other competitors, from the hospital physician services market.

71. As a result of Defendants' exclusionary conduct, described above, since May 6, 2022, over 20 hospitals have refused Dr. Hanna employment only after reviewing the Clinical Privileges Action report.

72. Plaintiff is informed and believes, and on that basis, alleges, that if Defendants' exclusionary conduct continues, Dr. Hanna will be prevented from obtaining additional business.

73. No legitimate business reason justifies Defendants' conduct. Defendants refused to perform any sort of investigation into the allegation within their Clinical Privileges Action. The filing of the Clinical Privileges Action was not based on any legitimate claims or concerns for patient safety.

74. Defendants' actions were based on false and fabricated information and were undertaken for the unlawful purpose of retaliation against Dr. Hanna for his resignation from both Envision and HMH.

75. Defendants imposed their exclusionary conduct to maintain and extend their market power in the market for hospital physician services. By threatening physicians with Clinical Privileges Actions, they have stifled the physicians' ability to contract with and be employed by Defendants' competitors.

76. Defendants engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to restrict competition against it, restrict competition in the relevant market, and retaliate against Dr. Hanna and other actual and potential competitors.

77. Defendants' exclusionary and anticompetitive conduct has reduced competition and enabled Defendant to maintain market power in the market for physician services. Defendant has:

   (a)    Reduced quality and safety of medical care by discouraging physicians from reporting concerns about working conditions and patient safety issues;

   (b)    Reduced quality competition in the market for hospital physicians by preventing physicians who leave Defendants' employment from obtaining employment or contracting services elsewhere; and

   (c)    Reduced options for patients and hospitals who need the services of a pediatric anesthesiologist.

**Defendant intentionally provided false information in the Clinical Privileges Action report.**

78. Defendants Mark Schlesinger and Hans Schmidt, working on behalf of both Defendants HMH and Envision, knew that the Clinical Privileges Action report contained false information.

79. Defendant Mark Schlesinger intentionally misrepresented the "suspension and investigation" of Dr. Hanna when conveying the Clinical Privileges Action report to the NPDB.

80. Defendants knew that the following statements they made within the Clinical Privileges Action were false:

   (a)    The date in which the suspension was issued and the "investigation" purportedly began;

(b)    The order in which Dr. Hanna resigned and the suspension and investigation were initiated;

(c)    The idea that Dr. Hanna missed any cellphone or overhead pager calls to the post-operative setting;

(d)    That Dr. Hanna was aware of an investigation, or that any such investigation or suspension existed, at the time of his resignation; and

(e)    The existence of an actual investigation before or after Dr. Hanna's resignation.

### **Defendants intentionally made material misrepresentations on at least four separate occasions.**

81.    **A first misrepresentation** was made by Defendant Mark Schlesinger on May 6, 2022 when he issued the fraudulent Backdated Letter (Exhibit B), and intentionally backdated the letter and phrased it to appear to have been written a day prior, on May 5, in order to fraudulently predate Dr. Hanna's suspension.

82.    **Defendant Mark Schlesinger knew that the representations made in the Backdated Letter were false.** In addition to backdating the letter of Exhibit B, Schlesinger also phrased the letter to describe events of "that day" in the present tense, as opposed to referring to them as the events of the previous day, indicating that the backdating of the letter was done to intentionally deceive the NPDB into believing that the Backdated Letter was issued on the same day as and at some point before Dr. Hanna's suspension.

83.    Defendant Mark Schlesinger's misrepresentation was material. The NPDB, in denying Dr. Hanna's appeal of the Clinical Privileges Action, specifically referred to the date on the Backdated Letter as evidence that the reporting Hospital's investigation and suspension could have occurred before Dr. Hanna resigned.

84.    Defendants intended for Defendant Mark Schlesinger's false misrepresentation to be relied upon by the NPDB when they sent the Backdated Letter (Exhibit B) in their Response to the NPDB Appeal (Exhibit F).

85.    As a direct and foreseeable consequence of Defendant Mark Schlesinger's fraudulent misrepresentation of the date on the Backdated Letter, the NPDB published the Clinical Privileges Action and denied Dr. Hanna's appeal, causing damages to his career and reputation. Over 20 hospitals have denied Dr. Hanna employment upon reviewing the Clinical Privileges Action report.

86.    The NPDB relied on the Backdated Letter when publishing the Clinical Privileges Action report. The NPDB relies on the facts supplied by the reporting entity and accepts them as true without investigating the underlying merits. Defendants intentionally took advantage of the NPDB's deference to the reporting entity's facts when they knowingly submitted the Backdated Letter.

87. **A second misrepresentation** was made by Defendants to the NPDB on June 16, 2022 (Exhibit E), when they submitted the fraudulent Clinical Privileges Action report which contained multiple statements which Defendants knew where false, including:

   (a)    The date in which the suspension was issued and the "investigation" purportedly began;

   (b)    The order in which Dr. Hanna resigned and the suspension and investigation were initiated;

   (c)    the idea that Dr. Hanna missed any cell phone or overhead pager calls to the post-operative setting;

   (d)    That Dr. Hanna was aware of an investigation, or that any such investigation or suspension existed, at the time of his resignation; and

   (e)    The existence of an actual investigation before or after Dr. Hanna's resignation.

**Defendants knew their statements in the Clinical Privileges Action report were false.**

88. Defendant Mark Schlesinger intentionally fabricated the Backdated Letter to predate Dr. Hanna's suspension, indicating that he knew that the suspension and investigation was not issued until after Dr. Hanna resigned, despite their claims to the contrary.

89. Defendants knew that no suspension or investigation existed prior to Dr. Hanna's resignation.

90. In fact, Defendant Mark Schlesinger called Dr. Hanna on May 5, 2022, at 5:44pm, a day before he issued the Backdated "suspension and investigation" Letter, to confirm Dr. Hanna's resignation. During this brief phone call, Defendant Schlesinger made no mention of any sort of suspension or investigation and simply confirmed Dr. Hanna's resignation. It was not until the next day, May 6, that Defendant Schlesinger issued the Backdated Letter. Thus, Defendants knew that no investigation existed at the time of Dr. Hanna's resignation.

91. **Defendants knew that the first underlying reason for the "suspension and investigation" described in the Clinical Privileges Action report was completely false.** In addition to fabricating the claim that Dr. Hanna failed to answer cellphone calls to the post-operative setting, Defendants actively suppressed evidence that would have proven these allegations false, and therefore must have already known they were false.

92. **Defendants knew that the second underlying reason for the "suspension and investigation" was completely false.** Defendants issued the Backdated Letter purportedly initiating the suspension and investigation on May 6, 2022, but had confirmed Dr. Hanna's resignation the previous day on May 5, 2022. Thus, Dr. Hanna's resignation could not possibly have been the "result of or to avoid" an investigation that was initiated a full day after he resigned.

93. The information Defendants fraudulently misrepresented on the Clinical Privileges Action report were material. The underlying reasons for the suspension and investigation are the basis of the Clinical Privileges Action report which caused the damage to Dr. Hanna's career and reputation.

94. As previously discussed, the NPDB relies on the facts as presented by the reporting entity as true, and does not evaluate the merits of the claims made. Thus, the NPDB was ignorant of the falsity of the statements made in the Clinical Privileges Action and relied on the representations' truth when they published the Action and denied Dr. Hanna's appeal.

95. By denying Dr. Hanna even a single hearing or the ability to submit any evidence, Defendants actively frustrated the search for truth and their conduct was calculated to thwart the judicial process.

96. **A third misrepresentation** was made by Defendants on August 15, 2022, (Exhibit F) when they sent the Backdated Letter to the NPDB in support of the Clinical Privileges Action, in order to falsely claim that the suspension and investigation began before Dr. Hanna resigned.

97. Defendants knew that their August 15, 2022 Response to the NPDB Appeal (Exhibit F) contained false information. Since Defendants were responsible for fabricating the Backdated Letter, as described above, they must have known of its falsity before sending it to the NPDB.

98. **A fourth misrepresentation** was made by Defendants on September 26, 2022, when Defendants replied to the Secretary indicating that an investigation occurred, when they knew that no such investigation existed. (See Exhibit H).

99. The NPDB, in relying on the reporting entity's facts as true, sought to confirm one final time that an investigation actually existed prior to the submission of the Clinical Privileges Action, and requested such confirmation in a letter dated September 9, 2022. Considering the simplicity of the allegations (missed cellphone calls can easily and instantaneously be confirmed by simply reviewing call logs), the NPDB assumed based on Defendants' September 26, 2022 letter confirming that they did investigate the "patient care incidents" on May 5, 2022 (Exhibit H) and that an actual investigation did occur.

100.    Defendants knew that the representation made on the September 26, 2022 letter was false. Defendants admit that the investigation was ended "in light of Dr. Hanna's resignation" and that due to his resignation he was denied the opportunity for a hearing or to submit evidence (see, Exhibits F and H). Since the investigation which began on May 6 ended on May 5, 2022, a day earlier than it began, when Dr. Hanna resigned, Defendants must have known that their representation (that there was any sort of investigation) made in the September 26 letter was completely false. Defendants opened and immediately closed an investigation solely for the purposes of defrauding Dr. Hanna and deceiving the NPDB.

101.    Dr. Hanna was not given any notice before the suspension was issued.

102.    The only "notice" he was given was in the Backdated Letter of May 6, one day after Dr. Hanna resigned, and which purportedly started the investigation which also ended immediately thereafter, "in light of Dr. Hanna's resignation".

103.    Dr. Hanna has exhausted both in-house hospital remedies and administrative remedies before the NPDB.

104.    The Defendant hospital refused to offer Dr. Hanna any hearings regarding the suspension.

**Dr. Hanna resigned to escape a hostile work environment and abuses by Defendants.**

105.    Dr. Hanna had previously complained of an abusive work environment.

106.    Dr. Hanna's complaints were sent directly to Defendant Mark Schlesinger.

107.    In particular, Dr. Hanna complained of patient care concerns and verbal abuse by a surgeon. Dr. Hanna's concerns were directed to the surgeon's technique and the negative outcomes of the surgeon's operations.

108.    Instead of responding to Dr. Hanna's concerns regarding the surgeon's competency, or the verbal abuse that Dr. Hanna suffered, Defendant Schlesinger ignored the complaints. The HCQIA mandates that any hospital must seriously investigate complaints and patient care concerns, a policy which Defendants subverted.

109.    Dr. Hanna also specifically stated that he was verbally abused by the surgeon in question, especially after voicing his concerns. Defendant Schlesinger did not address any of Dr. Hanna's complaints or concerns, and instead allowed this form of verbal abuse to continue.

110.    On May 5, 2022, the day Dr. Hanna resigned, another surgeon was verbally abusive towards Dr. Hanna regarding the condition of a patient, even though Dr. Hanna was not responsible for the patient's condition and had properly performed anesthesia services.

111.    In neither instance was Dr. Hanna responsible for any negative condition of either of the patients. This is evidenced by the fact that no medical malpractice claims have been brought against Dr. Hanna.

112.    Even after issuing a summary suspension and the purported "investigation" Defendants could not and did not raise a single claim or take any issue with Dr. Hanna's medical competence.

113.    Defendants never raised an issue with Dr. Hanna's medical competence because hospitals keep detailed patient records or charts that would easily and clearly exonerate Dr. Hanna, as an anesthesiologist, from any wrongdoing. Instead, Defendants opted to fabricate a claim of a failure to respond to phone calls.

114.    Dr. Hanna has never been responsible for any medical issues related to patients that he has anesthetized in his extensive 15+ year career.

**Defendants have shown a pattern of misconduct against other doctors.**

115.    This case is not an isolated incident. There is evidence of a pattern of Hackensack Meridian Health exploiting summary suspensions and threatening Clinical Privileges Action reports to the detriment of both patients and doctors. In at least one other instance, they have threatened the use of such actions against doctors who raised concerns about working conditions, creating a climate of fear and suppressing legitimate complaints.

116.    Defendants exhibit a pattern of fraudulent, malicious, and anti-competitive behavior. In at least two other instances, and likely more, Defendants have oppressively threatened physicians.

117.    Dr. Francois Merle was severely retaliated against for complaining about working conditions in accordance with procedures in the bylaws. Dr. Merle and other physicians agreed to sign a joint statement by which they complained of certain working conditions at HUMC.

118.    Defendant Mark Schlesinger, upon learning of the joint statement, threatened to issue Dr. Merle a summary suspension in direct response to Dr. Merle's working condition concerns. Schlesinger ordered Dr. Merle to use vacation days to avoid the suspension, which Dr. Merle did.

119.    However, Defendant Schlesinger informed the staff, through Monica Paganassi, that Dr. Merle's absence was due to a summary suspension as a result of the joint statement (even though no summary suspension was officially issued and technically Dr. Merle merely took vacation days. This purported suspension had the effect of frightening the other doctors who were parties to the joint statement from complaining about their working conditions.

120.    Dr. Francois Merle's letter of resignation describes in further detail the retaliation taken against him for attempting to raise concerns regarding working conditions at the hospital.

121.    Upon information and belief, Dr. Frederick Alexander was also retaliated against for resigning from an HMH hospital and attempting to work for a competitor.

**Defendants are not afforded immunity under the HCQIA, NJ Peer Review Act, NJ Cullen Act, Litigation Privilege, or any other means because they knowingly and maliciously provided false information in their report.**

122.    A hospital cannot frustrate the definition of what constitutes an "investigation" through its bylaws. Doe v. Leavitt, 552 F.3d 75, 85-86 (stating, "If, say, a hospital's bylaws used the word "investigation" to describe a phenomenon that ended upon the completion of fact-gathering, the Secretary would not be compelled to interpret Congress's use of the word "investigation" in lockstep with that idiosyncratic definition.").

123.    The HCQIA requires hospitals to submit reports to the NPDB whenever an adverse action is taken regarding a physician's clinical privileges.

124.    Reporting entities are not entitled immunity for reports submitted to the NPDB if the reporting entity knowingly submits false information in the report.

125.    As described above, Defendants knowingly submitted false information in their report, including at least that Dr. Hanna had missed any calls leading up to his resignation, that an investigation into Dr. Hanna's missed calls had begun before his resignation, and that HMH actually investigated whether or not Dr. Hanna missed calls.

126.    Defendants also failed to satisfy any one of the four requirements of §11112 of the HCQIA. In particular:

> (1) the action was not in the furtherance of quality health care, since the underlying reasons (missed cell phone calls) were completely fabricated;

> (2) there was no reasonable effort to obtain the facts of the matter, but rather, Defendants actively attempted to conceal and obscure the truth;

> (3) absolutely no notice was provided to Dr. Hanna before the summary suspension was issued – it was issued one day after he resigned. Further, Dr. Hanna was not afforded a single hearing, let alone "adequate hearing procedures" as required by the §11112 (3);

> (4) Any reasonable effort to obtain the facts of the matter regarding whether or not Dr. Hanna missed cellphone calls would have involved reviewing the call logs of the hospital or Dr. Hanna's cell phone, which never occurred and was instead actively suppressed by the Defendants.

127.    The New Jersey Peer Review Statute does not apply because:

> (1) the suspension was not made after a reasonable investigation (or any investigation at all);

> (2) the Defendants lacked a reasonable belief that the action was warranted (since they had to fabricate evidence in order to justify it); and

(3) the action was in fact taken with malice (evidenced by their fabrication of evidence).

128.    According to N.J.S.A. § 2A:84A-22.10(d), only reports that are made after a reasonable investigation, under a reasonable belief that the action was warranted, **and** where the action was taken without malice, are afforded immunity. Defendants need to satisfy all of these elements to be afforded immunity, but cannot satisfy even one.

129.    The New Jersey Cullen Act does not provide immunity for Defendants' actions and report because Defendants acted in bad faith when they backdated the suspension letter, and with malice when they issued the suspension after Dr. Hanna's resignation and immediately halted an investigation just as soon as it began, "in light of Dr. Hanna's resignation". The Cullen Act also does not apply because Dr. Hanna was not afforded even a single hearing, notice of his suspension, or the ability to submit evidence.

130.    The Third Circuit has found that the litigation privilege does not immunize "conduct calculated to thwart the judicial process." Alexander v. Hackensack Meridian Health, 2020 U.S. Dist. LEXIS 181224, *17 (quoting *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014)).

131.    The Defendants' purported "investigation" and decision does not preclude the present claims. Only hospital decisions which are made in good faith, after fundamentally fair proceedings, and upon sufficient reliable evidence are afforded preclusive effect. Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 96.

132.    Dr. Hanna was not afforded any opportunity to be heard. Defendants' "investigation" was not conducted in good faith, there were **no** proceedings nor hearings, and the decision of the Medical Executive Committee, which was comprised solely of Defendant Schlesinger and Defendant Schmidt, did not review any evidence in coming to their conclusion. Since the decision to suspend Dr. Hanna was not in good faith, did not include any proceedings or hearings, and was not based upon any evidence, the Defendant hospital's process in coming to that decision will not preclude the present claims.

133.    Dr. Hanna has suffered damages in the form of lost employment opportunities, valued at at least $500,000. Dr. Hanna was denied employment opportunities in New Jersey, Florida, Texas, Georgia, North Carolina, Texas, and many other states. In addition, Dr. Hanna was forced to relocate several times in an effort to obtain employment, even if on a temporary basis, and was forced to leave his wife and children, causing further damages in the amount of at least $130,000.

134.    Punitive damages in excess of the New Jersey Punitive Damages Act are warranted. Defendants have shown a pattern of repeated egregiously fraudulent conduct which is harming the public, especially in the state of New Jersey where they have monopoly power. Damages limited to 5 times compensatory damages would amount to $3,150,000, which is

less than .05%, or 1/20th of 1% of HMH's yearly revenue of nearly $8 billion. In other words, the NJ Punitive Damages Act limits damages to an amount that would be negligible to Defendants, and in order to properly deter Defendants from repeating their actions the punitive damages should be calculated by the court to be of an appropriate amount proportional to Defendants colossal income (accrued as a result of their anti-competitive conduct).

## III. CLAIMS FOR RELIEF

## <u>CAUSE OF ACTION I: RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §1</u>

135.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

136.    As explained above, beginning on or about May 6, 2022, Defendants have conspired to exclude Dr. Hanna from the hospital services market.

137.    Defendant HMH has market power in the market of hospital services as described above.

138.    The effect of Defendants' fraudulent Clinical Privileges Action has been to substantially lessen competition in the hospital services market by substantially preventing competitors from hiring Dr. Hanna.

139.    Defendants HMH and Envision, through their executives Defendants Schlesinger and Schmidt, entered into an unlawful agreement to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

140.    Defendants HMH and Envision are unrelated entities who conspired together. Particularly, HMH and Envision conspired to deprive Dr. Hanna of his ability to practice as an anesthesiologist by submitting the false report without investigating.

141.    HMH's Medical Executive Committee, comprised solely of Defendants Schlesinger and Schmidt, conspired with Envision when HMH unreasonably ended the investigation without ever confirming the allegations, referencing Dr. Hanna's employment contract with Envision as the reason for ending the investigation before it had begun.

142.    Defendant Mark Schlesinger is an anesthesiologist in competition with Dr. Hanna. Schlesinger conspired with Defendants Hans Schmidt, HMH, and Envision to restrain Dr. Hanna from competing as an anesthesiologist.

143.    Any action taken by a medical staff satisfies the "contract, combination or conspiracy" requirement. *Weiss v. York Hosp.*, 745 F.2d 786, 814-17 (1984), *cert. denied*, 470 U.S. 1060, 84 L. Ed. 2d 836, 105 S. Ct. 1777 (1985).

144.    Defendants' conduct has harmed competition and injured consumer welfare by, among other things:

    (a)    Decreasing competition and the anesthesiologists available to patients and hospitals;

    (b)    Dangerously decreasing the quality of hospital physician services by preventing physicians from raising concerns about working conditions;

    (c)    Decreasing actual entry in the potential entry of competitors into the relevant market by foreclosing them from entering into an agreement with Dr. Hanna;

    (d)    Denying patients, hospitals, and the public full and fair competition in the market by knowingly furnishing false information to the public in the Clinical Privileges Action.

145.    Defendants' exclusionary and anticompetitive conduct unreasonably restrains trade in violation of Section 1 of the Sherman Act.

146.    The Defendants' conduct had the purpose and effect of unreasonably restraining trade and commerce in the nationwide market for pediatric anesthesiology services. As a result of Defendants' actions, hospitals across the country have been unwilling to hire Dr. Hanna. In addition, Defendants' repeated abuse of the NPDB has the effect of:

    (a)    Foreclosing Dr. Hanna from access to potential customers, employers, and patients; substantially decreasing his business volume and revenue, preventing him from obtaining employment, increasing costs, and decreasing profitability of his medical practice;

    (b)    Substantially reducing present and future opportunities for Dr. Hanna to work with hospitals in the market for anesthesia services;

    (c)    Decreasing the profitability and value of Dr. Hanna's medical practice; and

    (d)    Increasing Dr. Hanna's costs associated with obtaining employment, forcing Dr. Hanna to relocate multiple times in an attempt to obtain employment.

147.    As a direct and proximate result of Defendants' illegal conduct alleged in this Complaint, Plaintiff has been injured in its business and property in an amount to be determined at trial.

148.    As a direct and proximate result of Defendants' continued threatened conduct alleged in this Complaint, Dr. Hanna is threatened with additional loss or damage to his medical practice for which monetary compensation alone is not an adequate remedy.

149.    Unless enjoined by an order of this Court, Defendants' fraudulent Clinical Privileges Action will continue to violate Section 1 of the Sherman Act.

150.    As a direct and proximate result of Defendants' illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

151.    Dr. Hanna is entitled to damages in an amount to be proven at trial, but exceeding $630,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

152.    Dr. Hanna is entitled to a permanent injunction requiring Defendants to amend and rescind their Clinical Privileges Action report and any other such similar reports made.

## CAUSE OF ACTION II: MONOPOLIZATION IN VIOLATION OF SHERMAN ACT, 15 U.S.C. §2

153.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

154.    As explained above, beginning on May 6, 2022, Defendants have engaged in anticompetitive behavior in furtherance of their maintaining monopoly power in the market for hospital services in the New Jersey, geographic market.

155.    HMH has 30% of the share of the New Jersey market for healthcare services, being a clear market leader, where only one other corporation has a share greater than 10%.

156.    Retaliating against physicians that leave HMH's hospitals by fraudulently suspending them effectively stifles competition. The suspended physicians are then unable to compete with HMH at a competing hospital, and competing hospitals are fraudulently robbed of the ability to hire physicians that they may need, believing them to have been suspended for patient care issues.

157.    By stifling competition in the New Jersey market, where HMH has significant market dominance, Defendant HMH hopes to maintain their monopoly power.

158.    Defendants' anticompetitive and monopolistic conduct affects interstate commerce. The fraudulent summary suspension is reported on the NPDB, where it has been accessed by hospitals and healthcare facilities across the United States. Dr. Hanna has been substantially foreclosed from employment for the past two and a half years.

159.    A geographic market is properly defined if a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but significant non-transitory increase in price ("SSNIP") on buyers in that market. U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, § 4.1.1, at 8-9 (2010). FTC v. Hackensack Meridian Health, Inc., 30 F.4th 160, 167

160.    Contracts between HMH and facilities it had merged with in the past show Defendant HMH's ability to raise rates. FTC v. Hackensack Meridian Health, Inc., 30 F.4th 160, 175. Defendant HMH's ability and history of actually raising prices at its facilities shows its actual market dominance and monopoly power within the New Jersey geographic market.

161.    Defendants' exclusionary conduct has injured Dr. Hanna by, among other things, foreclosing him from multiple employment opportunities.

162.    As a direct and proximate result of Defendants' illegal conduct alleged herein, Dr. Hanna has been injured in an amount to be determined at trial but believed to be more than $630,000.

163.    Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of Section 2 of the Sherman Act.

164.    As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Dr. Hanna is threatened with additional loss or damage to its business and property for which monetary compensation alone is not an adequate remedy.

165.    Dr. Hanna is entitled to an injunction requiring Defendant to fully rescind the Clinical Privileges Action report submitted to the NPDB and any other similar reports based on the same circumstances.

## CAUSE OF ACTION III: ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §2

166.    Plaintiff repeats, realleges, and incorporates by reference its allegations in all the preceding paragraphs as if fully set forth herein.

167.    As explained above, beginning on May 6, 2022, Defendants have engaged in anticompetitive behavior in furtherance of their maintaining monopoly power in the market for hospital clinical services in the Bergen County, New Jersey, geographic market.

168.    HMH has 30% of the share of the New Jersey market for healthcare services, being a clear market leader, where only one other corporation has a share greater than 10%.

169.    If HMH does not already possess monopoly power, there is a dangerous probability that Defendant will acquire the power to control prices and exclude competition in the market, as indicated by its market share and ability to actually control prices for their services.

170.    Defendant has willfully, knowingly, intentionally and with the specific intent to do so, attempted to monopolize the relevant market. Defendant has acted with the purpose of, and the conscious objective of, acquiring the power to control price and exclude competition in the relevant market. Defendant engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to restrict competition against it, restrict competition in the relevant market and harm Dr. Hanna and other competing hospitals, actual and potential.

171.    Retaliating against physicians that leave HMH's hospitals by fraudulently suspending them effectively stifles competition. The suspended physicians are then unable to compete with HMH at a competing hospital, and competing hospitals are fraudulently robbed of the ability to hire physicians that they may need, believing them to have been suspended for patient care issues. Thus, HMH's retaliatory conduct stifles competition for both its former physicians and for competing hospitals.

172.    By stifling competition in the New Jersey market, where HMH has significant market dominance, Defendant HMH hopes to obtain or maintain monopoly power.

173.    Defendants' anticompetitive and monopolistic conduct affects interstate commerce. The fraudulent summary suspension is reported on the NPDB, where it has been accessed by hospitals and healthcare facilities across the United States. Dr. Hanna has been substantially foreclosed from employment for the past two and a half years. Multiple hospitals have referenced the Clinical Privileges Action report as the reason for rejecting Dr. Hanna's employment applications.

174.    Defendants' exclusionary conduct has injured Dr. Hanna by, among other things, foreclosing him from multiple employment opportunities.

175.    As a direct and proximate result of Defendants' illegal conduct alleged herein, Dr. Hanna has been injured in an amount to be determined at trial but believed to be more than $630,000, based on his expected salary for two years.

176.    Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of Section 2 of the Sherman Act.

177.    As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Dr. Hanna is threatened with additional loss or damage to its business and property for which monetary compensation alone is not an adequate remedy.

178.    Dr. Hanna is entitled to an injunction requiring Defendant to fully rescind the Clinical Privileges Action report submitted to the NPDB and any other similar reports based on the same circumstances.

## CAUSE OF ACTION IV: FRAUD (COUNT I)

179.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

180.    Defendant Mark Schlesinger, on behalf of Defendants HMH and Envision, and in cooperation with Defendant Hans Schmidt, made a material misrepresentation of a fact when he backdated the "suspension and investigation" letter (Backdated Letter, Exhibit B).

Defendant Hans Schmidt's signature also appears on the Backdated Letter in addition to Schlesinger's.

181.    Defendant Mark Schlesinger knew that the date on the Backdated Letter was false. In addition to backdating the letter, Schlesinger also phrased the letter to describe events occurring "that day", even though Dr. Hanna had resigned a day earlier and was not at the hospital on May 6, 2022.

182.    Defendant Mark Schlesinger backdated the letter of Exhibit B with the intention that the NPDB rely on the information made therein, and particularly, rely on the date. Defendants are aware that the NPDB accepts as true the facts supplied by the reporting agency, and thus intended that the NPDB rely on their fabricated Backdated Letter as evidencing the start of an investigation. As per their guidelines, the NPDB reasonably relied upon the Backdated Letter.

183.    Dr. Hanna suffered damages as a result of the fraudulent misrepresentations made in the Backdated Letter. As a result of the Backdated Letter, the NPDB denied Dr. Hanna's appeal of the Clinical Privileges Action report. Multiple prospective employers have cited the Clinical Privileges Action report as their reason for denying Dr. Hanna employment.  The report, and thus the Backdated Letter which legitimized the report, foreclosed several employment opportunities from Dr. Hanna.

## CAUSE OF ACTION V: FRAUD (COUNT II)

184.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

185.    Defendants made at least five fraudulent misrepresentations of material facts when they submitted the Clinical Privileges Action report on June 16, 2022.

186.    In particular, upon submitting the Clinical Privileges Action, Defendants intentionally misrepresented the following facts:

(a)    The date in which the suspension was issued and the "investigation" purportedly began;

(b)    The order in which Dr. Hanna resigned, and the suspension and investigation were initiated;

(c)    The first underlying reason for the report, falsely claiming that Doctor Hanna missed any cellphone or overhead pager calls to the post-operative setting;

(d)    The second underlying reason for the report falsely claiming that Doctor Hanna was aware of an investigation, or that any such investigation or suspension existed, at the time of his resignation; and

(e)    The existence of an actual investigation.

187.    Defendants knew that each of these misrepresentations were false when they submitted the Clinical Privileges Action report.

188.    By Defendants' own admission, the "suspension and investigation" began when they sent the Backdated Letter of Exhibit B. The Backdated Letter was sent on May 6, 2022.

189.    By Defendants' own admission and as shown on Dr. Hanna's resignation letter (Exhibit A), Dr. Hanna resigned on May 5, 2022, and the purported "investigation" ended "in light of Dr. Hanna's resignation".

190.    Thus, Defendants knew that Dr. Hanna resigned before the investigation or suspension began, and their misrepresentations of the facts regarding (1) the initial date of the investigation, (2) the order in which Dr. Hanna resigned and the suspension and investigation were initiated, (4) the second underlying reason for the report which is that Dr. Hanna resigned "while under or to avoid an investigation", and (5) that an actual investigation existed at any point in time, are all false.

191.    Defendants knew that (3) no attempts were made to reach Dr. Hanna, since they were the party purportedly making those attempts and since such an allegation could have been quickly and instantaneously confirmed with even the most menial investigation (by reviewing their own call logs or those of Dr. Hanna's cell phone).

192.    These five misrepresentations were made in the Clinical Privileges Action with the intention that the NPDB rely on the misrepresentations as true so that they would publish the report and harm Dr. Hanna's medical practice. The NPDB reasonably relied on these misrepresentations as per their guidelines.

193.    Dr. Hanna suffered damages as a result of the submission of the Clinical Privileges Action report. Multiple potential employers have referred to the Clinical Privileges Action report as the sole reason for rejecting him employment. Thus, the Clinical Privileges Action report prevented Dr. Hanna from obtaining employment for more than one year, foreclosing him from more than one years' salary and costing him additional damages in relocation and moving expenses, in an amount to be determined at trial but believed to be greater than $630,000.

## CAUSE OF ACTION VI: FRAUD (COUNT III)

194.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

195.    Defendants fraudulently misrepresented a material fact when they sent fabricated evidence to the NPDB on August 15, 2022 in their Response to Dr. Hanna's appeal of the Clinical Privileges Action report (Defendants' "Response to the NPDB Appeal", Exhibit F).

196.    In their Response to the NPDB Appeal, Defendants once again misrepresented the start date of an investigation, as well as the underlying reasons for the investigation.

197.    Defendants submitted the Backdated Letter as evidence that the investigation began before Dr. Hanna resigned, even though the Backdated Letter was sent a full day after Dr. Hanna's resignation.

198.    Defendants intended that the NPDB rely on their misrepresentations in their August 15 Response to the NPDB Appeal.

199.    The NPDB reasonably relied on Defendants' false statements as per the NPDB guidelines. Specifically, the NPDB Secretary's Final Decision regarding Dr. Hanna's appeal of the Clinical Privileges Action report (Exhibit I) specifically refers to the misrepresentations made in Defendants' August 15 Response and the Backdated Letter as the reasons for denying the appeal. Particularly, the Secretary quotes the August 15 Response and refers to the Backdated Letter.

200.    As a result of Defendants' August 15 Response to the NPDB Appeal, Dr. Hanna's appeal of the Clinical Privileges Action was denied. As described above, the publishing of the Clinical Privileges Action has prevented Dr. Hanna from procuring employment.

## **CAUSE OF ACTION VII: FRAUD (COUNT IV)**

201.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

202.    Defendants fraudulently misrepresented a material fact in their September 26 Response to the NPDB, when they falsely stated that an investigation occurred into Dr. Hanna.

203.    Defendants knew that no investigation ever occurred related to Dr. Hanna. By Defendants' own admission, the investigation began on May 6, 2022, when they sent the Backdated Letter, and ended on May 5, a day before it began, when Dr. Hanna resigned. Thus, the investigation literally ended before it ever began or was immediately ended upon its initiation for the purpose of retaliating against Dr. Hanna.

204.    Since Defendants initiated the investigation with actual knowledge of Dr. Hanna's resignation and then ended the investigation immediately after it began "in light of Dr. Hanna's resignation", Defendants clearly knew that no meaningful investigation into the facts ever occurred.

205.    In fact, Defendants actively suppressed an investigation as opposed to conducting one. Defendants refused to allow Dr. Hanna to submit evidence that would have exonerated himself immediately. Even the most menial investigation into the alleged "failure to respond

to calls to the post-operative setting… made via cellphone" would have revealed that no calls were ever placed. Defendants could have reviewed their own call logs or allowed Dr. Hanna to submit his own, but instead refused to investigate or allow Dr. Hanna to rebut the claims by denying him even a single hearing.

206.    Defendants' claims were made with the intention that the NPDB rely on them. The NPDB relied on Defendants' September 26 confirmation that an investigation did actually occur when they decided to deny Dr. Hanna's appeal and publish the Clinical Privileges Action.

207.    The HCQIA sets requirements for Clinical Privileges Actions which include a mandatory investigation, and so Defendants' confirmation that an investigation did occur was a material fact in the Secretary's decision. The NPDB reasonably relied on Defendants statements as true, as per the NPDB guidelines.

208.    As a result of Defendants' September 26, 2022 misrepresentations, Dr. Hanna's appeal of the Clinical Privileges Action was denied. The publishing of the Clinical Privileges Action has prevented Dr. Hanna from procuring employment, causing damages as described above.

## CAUSE OF ACTION VIII: TRADE LIBEL

209.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

210.    The Clinical Privileges Action report was published on the National Practitioner Data Bank, where it was accessible to the public.

211.    Multiple potential employers of Dr. Hanna accessed and reviewed the Clinical Privileges Action report as published on the NPDB.

212.    The submission of the Clinical Privileges Action report was done with malice. Defendants knew that both of the underlying allegations contained therein were false.

213.    Defendants knew that the claim of "patient care concerns" was false. Particularly, Defendants claimed that the patient care concerns were due to missed calls to the post-operative setting made via cell phone, despite the fact that Defendants made no attempt to reach Dr. Hanna via cell phone.

214.    Defendants knew that the claim of a "resignation while under or to avoid investigation" was false. Defendants acknowledge that Dr. Hanna resigned on May 5 at 12:08pm. Defendant Schlesinger confirmed Dr. Hanna's resignation at 5:44pm. Despite their knowledge of Dr. Hanna's resignation, Defendants issued the "suspension and investigation" letter, which they admit was the start of their investigation and suspension, one day after Dr.

Hanna resigned. Thus, Defendants knew that Dr. Hanna had already resigned when they issued their suspension and investigation, and knew that the claim that Dr. Hanna resigned "while under or to avoid an investigation" was false, since no investigation existed at the time of Dr. Hanna's resignation.

215.    Defendants' actions were taken with malice. Courts have defined malice as "both injurious and transgressive of generally accepted standards of common morality or of law." *Di Cristofaro v. Laurel Grove Memorial Park*, 43 *N.J. Super.* 244, 255. Falsifying the underlying reasons for a suspension and investigation, backdating it to predate an employee's resignation, fabricating evidence to support it, and immediately ending the 'investigation' as soon as it begins is both injurious, as evidenced by the injuries to Dr. Hanna's career, and transgressive of generally accepted standards of common morality and law (fraud).

216.    As a direct and proximate result of Defendants' submission of the Clinical Privileges Action report, Dr. Hanna has suffered special damages and pecuniary harm in the form of lost employment prospects for over one year and relocation expenses, as described above.

## CAUSE OF ACTION IX: BREACH OF CONTRACT

217.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

218.    By and through the HMH Bylaws, Dr. Hanna had a contractual agreement with Defendant HMH. The HMH Bylaws are attached as Exhibit J.

219.    Medical staff by-laws constitute an enforceable contract between a hospital and members of its medical staff. *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 878.

220.    Defendants had a duty to follow the bylaws.

221.    Defendants failed to follow the procedures set forth in the Defendants' own Bylaws when they issued a summary suspension one day after Dr. Hanna resigned without affording Dr. Hanna an opportunity to be heard or submit evidence.

222.    Despite numerous efforts to obtain due process, including a "fair" hearing and appeal, Defendants failed to follow the procedures set forth in Defendant HMH's bylaws, as well as those set forth under the Health Care Quality Improvement Act, 42 USC §10001, which require notice of the allegations and charges made against Dr. Hanna, as well as due process comprising at least a hearing and investigation.

223.    Defendants breached Section 9.1.3 of HMH's Bylaws when they failed to provide Dr. Hanna with even a single hearing or appearance, and when they failed to give Dr. Hanna any notice of the complaints against him. Section 9.1.3 requires at least two weeks' notice prior to the "Investigating Committee's" scheduled meeting.

224.    Defendants breached Section 9.1.4 of HMH's Bylaws when they failed to allow Dr. Hanna to appear before the Medical Executive Committee.

225.    Defendants breached Section 9.2.2 of HMH's Bylaws when they refused Dr. Hanna's request for a hearing or appearance before the Medical Executive Committee.

226.    Defendants breached Section 10.1 of HMH's Bylaws when they denied Dr. Hanna's request for a hearing.

227.    Defendants abused section 10.1.4 of HMH's Bylaws when they suspended Dr. Hanna after he resigned and then used his resignation as a "waiver" of any rights "to a hearing" or due process. Upon information and belief, Section 10.1.4 of HMH's Bylaws are illegal under common law and the HCQIA, since this Section allows Defendants to forego actual factfinding and instead issue suspensions which can never be investigated and reviewed.

228.    Defendants breached Section 10.2(d) of HMH's Bylaws because Defendants did not cite the level of specificity required therein. No specific or representative charts, calls, or incidents were referenced by Defendants, who instead vaguely referred to "patient care incidents".

229.    Defendants breached Section 10.2(i) of HMH's Bylaws since Defendants did not advise that their purported investigation was a "fact-finding proceeding", nor was it. Any legitimate "fact-finding proceeding" regarding potential missed cellphone calls would have allowed call logs to be introduced as evidence.

230.    Defendants breached Section 10.6(a) of HMH's Bylaws when Defendant Mark Schlesinger stated that Dr. Hanna was not entitled to legal counsel (see, Exhibit B).

231.    Section 10.6(f) of HMH's Bylaws was breached because Dr. Hanna was denied the opportunity to submit written evidence. If Defendants hadn't breached this section, Dr. Hanna could have submitted his call logs which would have immediately exonerated him of the charge of missed cell phone calls.

232.    Section 10.6(h) of HMH's Bylaws was breached because Dr. Hanna was denied the opportunity to submit a statement and denied even a single hearing.

233.    Section 10.7 of HMH's Bylaws was breached because Defendants denied Dr. Hanna a hearing, provided no notice of the suspension, and Defendants made no attempt to look into the facts.

234.    Section 10.9 of HMH's Bylaws was breached because Defendants denied Dr. Hanna any opportunity to appeal the suspension.

235.    Defendants' breach of the employment contract was the direct and proximate cause of the injuries Dr. Hanna has sustained and is continuing to sustain, culminating in Defendants' filing of the Clinical Privileges Action report which has substantially foreclosed Dr. Hanna from employment for over one year and caused further damages in the form of relocation expenses, as described above.

236.    Defendants' actions were willful, wanton, and malicious, and further show a complete and deliberate indifference to public welfare.

## CAUSE OF ACTION X: JUDICIAL REVIEW FOR LACK OF FUNDAMENTAL FAIRNESS UNDER NEW JERSEY LAW

237.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

238.    The doctrine of "fundamental fairness" requires that a hospital must inform the physician of specific charges and afford the opportunity to appear and present evidence on their behalf. *Hernandez v. Overlook Hosp.*, 149 N.J. 68.

239.    Notice must be given of charges or proposed hospital action before hearing. *Guerrero v. Burlington County Memorial Hospital*, 70 N.J. 344, 359 (stating, "In *Sussman v. Overlook Hospital Ass'n*, 92 N.J. Super. 163, 179, 183 (Ch. Div. 1966), aff'd, 95 N.J. Super. 418 (App. Div. 1967), the court determined that a physician who had been denied staff privileges for personal reasons was entitled to notice of the specific reasons for denial prior to any hearing. *See also Birnbaum v. Trussel*l, 371 F. 2d 672, 679, n. 15 (2d Cir. 1966); *Silver v. Castle Memorial Hospital*, 53 Haw. 475, 497 P. 2d 564, 571, cert. den. 409 U.S. 1048, 93 S. Ct. 517, 34 L. Ed. 2d 500 (1972).").

240.    Dr. Hanna was never informed of the specific charges, never afforded any opportunity to appear nor present evidence, and not even given any notice before the suspension was issued. The only "notice" Dr. Hanna was given was in the Backdated Letter of May 6, one day after he resigned, and which purportedly started the investigation which also ended immediately thereafter "in light of Dr. Hanna's resignation".

241.    If Defendants had reviewed *any* evidence, they would have found that their claims were completely false. Had Defendants afforded Dr. Hanna a proceeding, he would have shown that his call logs completely exonerate him of the allegations. Had Defendants' actions and decisions been in good faith, they would not have suspended him after he resigned and then backdated the suspension letter to predate his resignation.

242.    Defendants' decision to summarily suspend and terminate Dr. Hanna's clinical privileges was arbitrary, capricious, and malicious, willfully failed to comply with their own bylaws, and deprived Dr. Hanna of due process and his right of fundamental fairness guaranteed by

the constitution of the State of New Jersey and is otherwise repugnant under the laws of New Jersey.

243.    Defendants' fraudulent and malicious actions have caused and are continuing to cause Dr. Hanna to suffer economic losses by foreclosing employment opportunities and making it difficult or impossible to secure employment as an anesthesiologist for more than one year, as described above.

## CAUSE OF ACTION XI: INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE UNDER NEW JERSEY LAW

244.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

245.    Dr. Hanna had a reasonable expectation of economic advantage in his future employment prospects. Dr. Hanna was not just a skilled anesthesiologist, but also a pediatric anesthesiologist. Pediatric anesthesiologists must demonstrate an immense amount of skill in their craft in order to ensure they provide the proper dosage for their much smaller, more fragile patients, where a small mistake in dosage could be fatal. Dr. Hanna has never been responsible for a single fatality. Thus, due to Dr. Hanna's commensurable skill, he clearly had a high expectation that he would be employed as an anesthesiologist.

246.    Dr. Hanna's reasonable expectation to continue employment as a pediatric anesthesiologist was substantially foreclosed as a direct result of Defendants' malicious interference.

247.    Defendants' conduct leading up to and underlying the Clinical Privileges Action report was fraudulent and malicious. It was done for the sole purpose of retaliating against Dr. Hanna for resigning and for complaining of working conditions. The Defendants' maliciousness is evidenced by their fabrication of evidence, intentional deception of the NPDB and Secretary of HHS, and their outright refusal to offer Dr. Hanna a single hearing or review any evidence that would have exonerated Dr. Hanna.

248.    Dr. Hanna suffered substantial economic losses as result of Defendants' actions. In particular, Dr. Hanna suffered losses in the form of at least one year salary and relocation expenses, as described above.

## CAUSE OF ACTION XII: RESTRAINT OF TRADE IN VIOLATION OF THE NEW JERSEY ANTITRUST ACT, N.J. Stat. § 56:9-3

249.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

250.    As explained above, beginning on or about May 6, 2022, Defendants have conspired to exclude Dr. Hanna from the hospital services market.

251.    Defendant HMH has market power in the market of hospital services as described above.

252.    The effect of Defendants' fraudulent Clinical Privileges Action has been to substantially lessen competition in the hospital services market by substantially preventing competitors from hiring Dr. Hanna.

253.    Defendants HMH and Envision are unrelated entities who conspired together. Particularly, HMH and Envision conspired to deprive Dr. Hanna of his ability to practice as an anesthesiologist by submitting the false report without investigating.

254.    HMH's Medical Executive Committee, comprised solely of Defendants Schlesinger and Schmidt, conspired with Envision when HMH unreasonably ended the investigation without ever confirming the allegations, referencing Dr. Hanna's resignation as the reason for ending the investigation before it had begun, even though Dr. Hanna had already resigned when the investigation began, indicating that no investigation actually took place.

255.    Defendant Mark Schlesinger is an anesthesiologist in competition with Dr. Hanna. Schlesinger conspired with Defendants Hans Schmidt, HMH, and Envision to restrain Dr. Hanna from competing as an anesthesiologist.

256.    Defendants' conduct has harmed competition and injured consumer welfare by, among other things:

(a)    Decreasing competition and the anesthesiologists available to patients and hospitals;

(b)    Dangerously decreasing the quality of hospital physician services by preventing physicians from raising concerns about working conditions;

(c)    Decreasing actual entry in the potential entry of competitors into the relevant market by foreclosing them from entering into an agreement with Dr. Hanna;

(d)    Denying patients, hospitals, and the public full and fair competition in the market by knowingly furnishing false information to the public in the Clinical Privileges Action.

257.    Defendants' exclusionary and anticompetitive conduct unreasonably restrains trade in violation of the New Jersey Antitrust Act.

258.    The Defendants' conduct had the purpose and effect of unreasonably restraining trade and commerce in the market for anesthesiology services in New Jersey. As a result of Defendants' actions, hospitals in New Jersey have been unwilling to hire Dr. Hanna. In addition, Defendants' repeated abuse of the NPDB has the effect of:

(a)    Foreclosing Dr. Hanna from access to potential customers, employers, and patients; substantially decreasing his business volume and revenue, preventing him from obtaining employment, increasing costs, and decreasing profitability of his medical practice;

(b)    Substantially reducing present and future opportunities for Dr. Hanna to work with hospitals in the market for anesthesia services;

(c)    Decreasing the profitability and value of Dr. Hanna's medical practice; and

(d)    Increasing Dr. Hanna's costs associated with obtaining employment, forcing Dr. Hanna to relocate multiple times in an attempt to obtain employment.

259.    As a direct and proximate result of Defendants' illegal conduct alleged in this Complaint, Plaintiff has been injured in its business and property in an amount to be determined at trial but believed to be more than $630,000.

260.    As a direct and proximate result of Defendants' continued threatened conduct alleged in this Complaint, Dr. Hanna is threatened with additional loss or damage to his medical practice for which monetary compensation alone is not an adequate remedy.

261.    Unless enjoined by an order of this Court, Defendants' fraudulent Clinical Privileges Action will continue to violate the New Jersey Antitrust Act.

262.    As a direct and proximate result of Defendants' illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

263.    Dr. Hanna is entitled to damages in an amount to be proven at trial, but exceeding $630,000, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

264.    Dr. Hanna is entitled to a permanent injunction requiring Defendants to amend and rescind their Clinical Privileges Action report and any other such similar reports made.

## CAUSE OF ACTION XIII: MONOPOLIZATION IN VIOLATION OF THE NEW JERSEY ANTITRUST ACT, N.J. Stat. § 56:9-4

265.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

266.    As explained above, beginning on May 6, 2022, Defendants have engaged in anticompetitive behavior in furtherance of their maintaining monopoly power in the market for hospital services in the New Jersey, geographic market.

267.    HMH has 30% of the share of the New Jersey market for healthcare services, being a clear market leader, where only one other corporation has a share greater than 10%.

268.   Retaliating against physicians that leave HMH's hospitals by fraudulently suspending them effectively stifles competition. The suspended physicians are then unable to compete with HMH at a competing hospital, and competing hospitals are fraudulently robbed of the ability to hire physicians that they may need, believing them to have been suspended for patient care issues.

269.   By stifling competition in the New Jersey market, where HMH has significant market dominance, Defendant HMH hopes to maintain their monopoly power.

270.   Defendant HMH's ability and history of actually raising prices at its facilities shows its actual market dominance and monopoly power within the New Jersey geographic market.

271.   Defendants' exclusionary conduct has injured Dr. Hanna by, among other things, foreclosing him from multiple employment opportunities.

272.   As a direct and proximate result of Defendants' illegal conduct alleged herein, Dr. Hanna has been injured in an amount to be determined at trial but believed to be more than $630,000.

273.   Unless restrained by an order of this Court, Defendant will continue to monopolize the relevant market in violation of the New Jersey Antitrust Act.

274.   As a direct and proximate result of Defendant's continued threatened conduct alleged in this Complaint, Dr. Hanna is threatened with additional loss or damage to its business and property for which monetary compensation alone is not an adequate remedy.

275.   Dr. Hanna is entitled to an injunction requiring Defendant to fully rescind the Clinical Privileges Action report submitted to the NPDB and any other similar reports based on the same circumstances.

## CAUSE OF ACTION XIV: VIOLATION OF DUE PROCESS UNDER THE FOURTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES

276.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

277.   Medical staff privileges have been recognized to be a liberty and property interest protected by the Fourteenth Amendment. They may only be limited or revoked after a hearing and due process. Defendants had a duty to ensure that Dr. Hanna's property interests were not impeded without due process.

278.   Defendants did not have reasonable grounds for revoking his Clinical Privileges without ever investigating the underlying claims and without affording Dr. Hanna a chance to be heard or submit evidence.

279.   Dr. Hanna resigned on May 5, 2022 (Exhibit A). On May 6, a suspension and investigation were initiated. (Exhibit B, Backdated Letter). Also on May 6, the investigation was ended "in light of Dr. Hanna's resignation". (Exhibits C and D, correspondence between Defendants Schlesinger and Schmidt).

280.   Defendants admit that Dr. Hanna was denied due process. On May 6, 2022, the same day that the suspension was issued, and the investigation was initiated, Defendant Schlesinger wrote the Exhibit C letter to Dr. Hanna informing him that due to his resignation, he "waived any right to a hearing or due process".

281.   Dr. Hanna was denied a hearing before and after his clinical privileges were suspended. Defendants halted their purported "investigation" immediately after initiating it and before any meaningful investigation into the actual facts took place. The Clinical Privileges Action report was submitted without any investigation, hearings, or review of evidence.

282.   Defendants denied Dr. Hanna the opportunity to submit evidence and did not investigate the underlying reasons for the suspension themselves.

283.   Defendants' stated reason for the suspension was due to "patient care concerns" which were solely based on an alleged "failure to respond to calls to the post-operative setting… made via cellphone". No calls were made via cellphone and Defendants failed to investigate their own call history to confirm their allegations.

284.   Dr. Hanna was not provided any notice of the allegations against him. Instead, he was summarily suspended without an investigation, and upon attempting to appeal or rebut the allegations, he was denied any sort of hearing "in light of [his] resignation".

285.   When Defendants issued the Backdated suspension Letter on May 6, 2022, and subsequently reported the suspension in the Clinical Privileges Action report on June 16, 2022, they completely denied Dr. Hanna due process.

286.   As a result of the backdated suspension and subsequent report, Dr. Hanna has been substantially deprived of the ability to practice medicine.

287.   The hospitals and potential employers described above have all denied Dr. Hanna's application for employment, referencing the suspension and subsequent report.

288.   Defendants acted under color of federal law. The HCQIA mandates such reports to the NPDB. Instead of conducting their own investigation, the United States Department of

Health and Human Services delegates the responsibilities of due process and a fair hearing to the reporting entity. The NPDB mandates that the reporting entity afford due process to the physician before submitting a report. Defendants' explicit denial of due process therefore offends the constitution.

289.    Defendants' actions were willful, wanton, and malicious, and further show a complete and deliberate indifference to, and conscious disregard for, public safety. Plaintiff is therefore entitled to an award of punitive damages in an amount that would deter Defendants and similarly situated healthcare corporations from like conduct in the future.

WHEREFORE, Plaintiff(s) request(s) that the Court enter judgment against Defendant(s) granting Plaintiff(s) the following relief:

A. The entry of judgment in favor of the Plaintiff(s) on all Counts and Causes of Action;

B. The award of $630,000 in compensatory damages;

C. Punitive Damages as a result of Defendants' willful and malicious conduct which is in direct contradiction to public policy, as determined by the Court;

D. The award of costs of the suit, interest, and attorney's fees;

E. A permanent injunction requiring HMH to rescind the Clinical Privileges Action report; and

F. Such other relief as the Court deems just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues that are so triable.

DESIGNATION OF TRIAL COUNSEL

Michael Youssef is hereby designated as trial counsel in this matter.

CERTIFICATION PURSUANT TO R. 4:5-1

I certify that, to the best of my knowledge, the matter in controversy is not the subject of another action pending in the Superior Court of New Jersey. I certify that there are no other actions or arbitration proceedings contemplated. At the present time, I do not know the names of any other parties who should be joined in this action.

Dated: November 29, 2024

By:    _____

Michael Youssef
NJ ID No. 399432022
10 Anderson Court, East Brunswick, NJ
(202) 855-4054
michael@locklesslegal.com
Attorney for Plaintiff Hani Hanna, M.D.


Attachments:

- Exhibit A- Dr. Hanna's Resignation Email sent on May 5, 2022
- Exhibit B- Backdated Letter sent on May 6, 2022
- Exhibit C- Letter from Schlesinger to Schmidt ending the "investigation" on May 6
- Exhibit D- Reply by Schmidt to Schlesinger's Exhibit C Letter
- Exhibit E- Clinical Privileges Action report submitted by Defendants on June 16, 2022
- Exhibit F- Defendants' Response to the Appeal of the Clinical Privileges Action Report
- Exhibit G- Dr. Hanna's Call Logs for the month of May
- Exhibit H- Defendants' September 26, 2022 Response to the NPDB inquiry as to whether an investigation ever actually occurred.
- Exhibit I- The Secretary's Final Decision regarding Dr. Hanna's appeal
- Exhibit J- HMH Bylaws