**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| HANI HANNA, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>HACKENSACK MERIDIAN HEALTH, *et al.*,<br><br>Defendants. | No. 24-cv-10736<br><br><br>**OPINION & ORDER** |

**CECCHI, District Judge.**

Before the Court is defendant New Jersey Healthcare Specialists P.C.'s ("NJHS") motion to dismiss plaintiff Hani Hanna's ("Plaintiff") second amended complaint ("SAC"). ECF No. 52; *see* ECF No. 52-1 ("Moving Br."); ECF No. 43 ("SAC"). Plaintiff opposed the motion, *see* ECF No. 56 ("Opp'n Br"), and NJHS replied, *see* ECF No. 67. The Court decides the motion without oral argument. Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, the Court will grant NJHS's motion to dismiss.

## I.      BACKGROUND[1]

Plaintiff is an anesthesiologist. SAC ¶ 5. Until May 2022, Plaintiff provided anesthesia services for defendant Hackensack Meridian Health ("HMH"), including at HMH's Hackensack University Medical Center ("HUMC") in northern New Jersey. *Id.* ¶¶ 5–11. However, Plaintiff was not employed directly by HMH; instead, he was employed by defendant NJHS, "an organization which employs various specialized doctors, such as anesthesiologists, . . . and contracts them to work at hospitals" like HUMC. *Id.* ¶ 7; *see also* ECF No. 43-1, Ex. C.

---

[1] For purposes of the motion to dismiss, the Court accepts the SAC's well-pled factual allegations as true, construes them in the light most favorable to Plaintiff, and draws all reasonable inferences in Plaintiff's favor. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327–28 (3d Cir. 2022).

According to Plaintiff, at 12:08 PM on May 5, 2022, Plaintiff "resigned from his position at HUMC" in an email to defendant Dr. Mark Schlesinger, the chair of the anesthesia department at HMH and a vice president of NJHS.  SAC ¶¶ 9, 11.  In his email, Plaintiff wrote, "I hate when the whole hospital is questioning my . . . work pointing fingers."  ECF No. 43-1, Ex. A.  Before resigning, Plaintiff allegedly "ensur[ed] proper coverage for his duties" for that day.  SAC ¶ 11.

Dr. Schlesinger "issued [Plaintiff] a suspension" by letter dated May 5, 2022.  *Id.* ¶¶ 12, 17; ECF No. 43-1, Exs. B, J.  According to the letter, "this action [was] taken as a result of patient care incidents that occurred [that day] and raised concerns about patient safety."  ECF No. 43-1, Ex. B.  Plaintiff alleges that the "patient care incidents" mentioned in the letter referred to his purported "failure to respond to calls in the post-operative setting . . . made via cell phone and on the overhead paging system."  SAC ¶ 36 (citing ECF No. 43-1, Ex. F).  Plaintiff alleges that these incidents never took place.  *Id.* ¶¶ 22–24, 36–41.  Plaintiff also alleges that Dr. Schlesinger's letter was "backdated" and that he received the letter on May 6, 2022.  *Id.* ¶ 12.

On May 6, 2022, Dr. Schlesinger wrote to defendant Dr. Hans Schmidt, the president of medical and dental staff at HUMC.  *Id.* ¶¶ 8, 13 (citing ECF No. 43-1, Ex. C).  In the letter, Dr. Schlesinger wrote that based on "his employment agreement, [Plaintiff] waived any right to challenge or review the termination of his Clinical Privileges and membership on the medical staff at HUMC, including any rights to a hearing or due process otherwise available under HUMC's Medical Staff Bylaws."  ECF No. 43-1, Ex. C.  Dr. Schmidt responded, "agreeing that [Plaintiff] waived 'any rights to a hearing or due process' due to his resignation."  SAC ¶ 14.

Plaintiff alleges that defendants issued the suspension after Plaintiff resigned "to immediately halt their 'investigation' as soon as it began."  *Id.* ¶ 18.  In doing so, Plaintiff alleges, "Defendants ensured that their false claims could not be rebutted or questioned because their

2

bylaws allowed them to immediately end the investigation due to [Plaintiff's] resignation." *Id.* As a result, Plaintiff "was not afforded any opportunity to be heard whatsoever." *Id.* ¶ 19.

Based on the purported events leading to what Plaintiff alleges was a sham suspension, Defendants submitted a Clinical Privileges Action ("CPA") report to the National Practitioner Data Bank ("NPDB") and the Secretary of the Department of Health and Human Services ("DHHS") "falsely alleging that (1) [Plaintiff] failed to respond to cellphone calls in the post-operative setting[] and (2) [Plaintiff] resigned after learning of an investigation into his purported failure to respond to cell phone calls."[2] *Id.* ¶¶ 10, 21 (citing ECF No. 43-1, Ex. E); *see also id.* ¶ 25. Plaintiff unsuccessfully appealed the CPA report; he claims that his appeal was unsuccessful in part because "Defendants [allegedly] submitted . . . fabricated evidence, including [Dr. Schlesinger's suspension letter], to the Secretary." *Id.* ¶¶ 27–28. According to Plaintiff, "[t]he NPDB relied on the date on the [letter] in denying [Plaintiff's] appeal." *Id.* ¶ 32 (citing ECF No. 43-1, Ex. I). Plaintiff alleges that defendants "intentionally took advantage of the NPDB's Dispute Resolution process by falsifying the underlying reasons for the report and . . . intentionally denying [Plaintiff] the right to dispute it in any way before making the NPDB report." *Id.* ¶ 34.

According to Plaintiff, "[t]he [CPA] report was published on the [NPDB], where it was accessible to the public," including by "hospitals and healthcare facilities across the United States." *Id.* ¶¶ 159, 211. Plaintiff alleges that "multiple prospective employers" viewed the CPA report, depriving him of several employment opportunities.[3] *Id.* ¶¶ 55, 159, 174, 184, 212; *see also id.* ¶¶

---

[2] The NPDB "was established by" the DHHS Secretary "under the authority of the Health Care Quality Improvement Act of 1986, . . . as a means of collecting and releasing 'certain information relating to the professional competence and conduct of physicians, dentists, and other health care practitioners.'" *Langenberg v. Warren Gen. Hosp.*, No. 12-175, 2013 WL 6147576, at *3 n.2 (W.D. Pa. Nov. 22, 2013) (citations omitted).

[3] In his opposition, Plaintiff states that he is or was "temporar[ily] employ[ed]" in a different part of the country. Opp'n Br. at 11 (citing SAC ¶ 134).

134, 253.  Plaintiff also alleges that his experience is part of "a pattern of fraudulent, malicious, and anti-competitive behavior."  *Id.* ¶ 117.  According to Plaintiff, "[i]n at least two other instances, . . . Defendants have oppressively threatened physicians" "who raised concerns about [poor] working conditions."  *Id.* ¶¶ 116–22.  For example, Plaintiff alleges that "Dr. Frederick Alexander was also retaliated against for resigning from an HMH hospital and attempting to work for a competitor."  *Id.* ¶ 122.

Plaintiff filed his initial complaint on November 25, 2024, ECF No. 1, and then amended his complaint on February 7, 2025, ECF Nos. 6, 14–15, 17.  HMH, Dr. Schmidt, and Dr. Schlesinger answered the amended complaint on February 13, 2025.  ECF No. 19.  Plaintiff filed the SAC on September 8, 2025, which for the first time named NJHS as a defendant.  SAC.  NJHS filed its motion to dismiss shortly thereafter.  ECF No. 52.

## II.    LEGAL STANDARD

A motion under Rule 12(b)(6) seeks dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To state a claim upon which relief can be granted, a pleading must generally "contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  To do so, the pleading must state a plausible claim, meaning it must contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the misconduct alleged.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  However, when a claim sounds in fraud, the pleading "must state with particularity the circumstances constituting fraud," though "intent, knowledge, and other conditions of a person's mind may be alleged generally."  *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)).  In other words, a pleading must support fraud allegations "with all of the essential factual background that

4

would accompany the first paragraph of any newspaper story—that is, the who, what, when, where[,] and how of the events at issue." *Id.* (citation omitted).

The Court conducts a three-step analysis when considering a Rule 12(b)(6) motion. First, the Court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (alterations in original) (quoting *Iqbal*, 556 U.S. at 675). Second, the Court disregards formulaic recitations of a claim's elements; legal conclusions; and allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Lutz*, 49 F.4th at 327–28 (citation omitted). Third, as stated above, the Court assumes the truth of the complaint's "remaining allegations," construes "them in the light most favorable to the plaintiff," draws "all reasonable inferences in the plaintiff's favor," and then determines whether the plaintiff has stated a viable claim for relief. *Id.* at 328.

## III. <u>DISCUSSION</u>

Plaintiff asserts fourteen claims for relief. SAC ¶¶ 136–290. Specifically, Plaintiff asserts (1) five antitrust claims, three under the Sherman Act, 15 U.S.C. §§ 1–7, *see* SAC ¶¶ 136–79, and two under the New Jersey Antitrust Act ("NJAA"), N.J. Stat. Ann. § 56:9-1 to -19, *see* SAC ¶¶ 250–76; (2) four fraud claims, *id.* ¶¶ 180–209; (3) a claim for trade libel, *id.* ¶¶ 210–17; (4) a claim for breach of contract, *id.* ¶¶ 218–37; (5) a claim for "lack of fundamental fairness," *id.* ¶¶ 238–44; (6) a claim for intentional interference with prospective business advantage, *id.* ¶¶ 245–49; and (7) a due process claim,[4] *id.* ¶¶ 277–90. For the reasons stated below, the Court will dismiss all of Plaintiff's claims against NJHS.

---

[4] Plaintiff cites the Fourteenth Amendment, *see, e.g.*, SAC ¶¶ 278, which binds the States, *Borrell v. Bloomsburg Univ.*, 870 F.3d 154, 160–61 (3d Cir. 2017). However, Plaintiff's due process claim appears to rely on alleged *federal* government action, SAC ¶ 289, so the relevant constitutional provision is the Fifth Amendment, *Citizens for Health v. Leavitt*, 428 F.3d 167, 178 (3d Cir. 2005); *see also Emrit v. Access Rx*, No. 15-936, 2015 WL 6689294, at *3 (D. Ariz. Nov. 3, 2015).

### A.    Plaintiff's Antitrust Claims (Causes of Action I–III & XII–XIII)

The Court will dismiss Plaintiff's antitrust claims against NJHS, because Plaintiff has failed to plausibly allege antitrust standing.[5]  "[A]ntitrust standing . . . is a threshold requirement in any antitrust case" and ensures that "the plaintiff is a proper party to bring [the] private antitrust action."  *Phila. Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018) (citation omitted).  Whether a plaintiff has antitrust standing hinges on five factors, one of which is "whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress," *i.e.*, an antitrust injury.  *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 232–33 (3d Cir. 2013) (citation omitted).  Antitrust injury "is a necessary but insufficient condition of antitrust standing."  *Id.* at 233 (citation omitted).

Antitrust injury requires harm to competition, not just harm to the plaintiff.  *See McLoughlin v. Cantor Fitzgerald L.P.*, 162 F.4th 378, 388 (3d Cir. 2025).  In addition, antitrust injury "is limited to consumers and competitors in the restrained market and to those whose injuries

---

[5] Plaintiff asserts three types of antitrust claims.  First, he asserts claims for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and the NJAA's companion provision, N.J. Stat. Ann. § 56:9-4, *see* SAC ¶¶ 154–66, 266–76.  Second, he asserts a claim for attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, *see* SAC ¶¶ 167–79.  And third, he asserts claims for an unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the NJAA's companion provision, N.J. Stat. Ann. § 56:9-3, *see* SAC ¶¶ 136–53, 250–65.  Because the NJAA "is essentially a replica" of the Sherman Act, the Court must consider his companion state law claims in tandem with his federal claims.  *Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 294 n.19 (D.N.J. 2023); *see Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 F. App'x 890, 896 n.5 (3d Cir. 2012) (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 920 (N.J. Super. Ct. App. Div. 1995)); *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 n.2 (3d Cir. 2009) ("[T]he state law antitrust claims are only viable if the corresponding federal claims are sufficient.").  Relevant here, in keeping with the New Jersey legislature's demand that the NJAA be "construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes," N.J. Stat. Ann. § 56:9-18, federal and state courts apply the antitrust standing requirement to NJAA claims, *see, e.g.*, *Bocobo*, 477 F. App'x at 899; *Treace Med. Concepts, Inc. v. Stryker Corp.*, No. 24-9763, 2025 WL 2803345, at *3 (D.N.J. Oct. 2, 2025); *Van Natta Mech. Corp. v. Di Staulo*, 649 A.2d 399, 407 (N.J. Super Ct. App. Div. 1994).  Indeed, the Parties take as given that the antitrust standing requirement applies with equal force to the NJAA claims.  *See* Moving Br. at 36–37; Opp'n Br. at 28.

are the means by which the defendants seek to achieve their anticompetitive ends." *Ethypharm*, 707 F.3d at 233 (citation omitted).  As such, in considering whether the plaintiff has experienced an antitrust injury, courts must generally take stock of the relevant market.  *See, e.g.*, *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491, 508–09 (D.N.J. 2018); *Premier Comp Sols. LLC v. UPMC*, 163 F. Supp. 3d 268, 278 (W.D. Pa. 2016); *see also Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997) (noting that the determination of whether a party has suffered an antitrust injury "depends on how th[e] market is defined").  And in that inquiry, the Court must keep in mind that "'the outer boundaries of a relevant market are determined by reasonable interchangeability of use' of a particular product [or service] within a particular geographic area."  *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018) (citation omitted).

With respect to his antitrust claims, Plaintiff's alleged injuries stem from the labor market for "anesthesiologists" in the United States.[6]  SAC ¶¶ 62–63; *see* Opp'n Br. at 10 ("Dr. Schlesinger

---

[6] Because Plaintiff will be allowed to replead his antitrust claims, the Court makes a few relevant observations:

(1) At times, Plaintiff appears to allege that the relevant geographic market is the State of New Jersey.  *See, e.g.*, SAC ¶¶ 63, 158.  However, those allegations are contradicted by more detailed allegations in the SAC, including the allegation that after he left HUMC, Plaintiff sought employment as far away as Texas.  *Id.* ¶¶ 134, 159, 174; *see also* Opp'n Br at 11 (citing statistics about the number of hospitals in the United States);

(2) Plaintiff claims in his opposition that he directly competes with hospitals and hospital systems like HUMC and HMH in the patient-facing market for "anesthesiology services."  Opp'n Br. at 6.  But Plaintiff's own factual allegations foreclose that argument.  Specifically, Plaintiff does not allege that he is an independent provider of anesthesiology services to patients; instead, he alleges that he is hired by entities like HMH and NJHS to provide services.  *See, e.g.*, SAC ¶¶ 5, 7, 61–63, 72, 159, 162, 174–75, 184; and

(3) Relatedly, Plaintiff alleges that defendants' conduct has harmed patients (*e.g.*, by decreasing the quality of anesthesiology services).  *See id.* ¶¶ 78, 145.  To the extent Plaintiff relies on this harm to demonstrate his own antitrust injury, Plaintiff appears to fuse the labor market for anesthesiologists with the separate market in which patients receive medical care.  *See, e.g.*, *id.* ¶¶

had to ensure that his 'product,' the anesthesiologists, would cooperate, even if it meant forcing them to put up with hazardous workplace conditions."). For instance, the SAC details a labor market whereby hospitals or hospital networks (either directly or via intermediates like NJHS) hire anesthesiologists like Plaintiff to provide services to patients. *See, e.g.*, SAC ¶¶ 5–7, 67, 72, 86; *see also Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 305 F. Supp. 2d 422, 426 (D.N.J. 2004), *aff'd*, 477 F. App'x 890 (3d Cir. 2012). And Plaintiff alleges that anesthesiologists like him participate in a labor market that spans most of the country. *See, e.g.*, SAC ¶¶ 61, 134, 159, 174.

Plaintiff alleges that NJHS and other defendants harmed him by hindering his employment opportunities. *Id.* ¶¶ 62–63, 134; *see also* Opp'n Br. at 6, 10. For instance, Plaintiff alleges that he "has been unable to secure consistent employment for the past two and a half years due to the Defendants' submission of the fraudulent [CPA] report." SAC ¶ 58; *see also id.* ¶¶ 61, 63, 71–72, 147. He also alleges that "was denied employment opportunities in New Jersey, Florida, Texas, Georgia, North Carolina, . . . and many other states" as a result of the report. *Id.* ¶ 134. Moreover, Plaintiff alleges that he "was forced to relocate several times in an effort to obtain employment." *Id.*; *see also id.* ¶ 147(a); Opp'n Br. at 12.

---

78, 116, 145, 147; Opp'n Br. at 6. To be sure, those markets are related—as alleged, one is upstream from the other. *See* SAC ¶¶ 5–7. Nonetheless, they are distinct, and Plaintiff may not "artificially create" an antitrust injury by pointing to harms *others* allegedly suffered *in other markets*. *AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1080 (C.D. Cal. 2015) (citation omitted), *aff'd sub nom. AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293 (9th Cir. 2017); *see Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1110 (N.D. Cal. 2022) ("Plaintiff cannot demonstrate antitrust injury sufficient to sustain his claims through references to alleged anticompetitive acts that have no relation to Plaintiff or the harm that he experienced."); *see also Hogan v. Amazon.com, Inc.*, No. 24-1893, 2025 WL 869202, at *1 (9th Cir. Mar. 20, 2025) ("Because these markets are distinct, Plaintiffs have not alleged antitrust injury."); *Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc.*, No. 16-1000, 2017 WL 4685359, at *8 (M.D. Pa. Oct. 18, 2017) ("[I]n an effort to allege anticompetitive effects beyond their own injuries, Plaintiffs mistakenly conflate two distinct markets.").

These allegations are insufficient to state an antitrust injury. Although he alleges that defendants' conduct has limited his own employment opportunities, Plaintiff has not plausibly alleged that he has been substantially shut out of the relevant labor market. *Bocobo*, 477 F. App'x at 897–98. Nor has he plausibly alleged that defendants' conduct is part of some larger effort by defendants to manipulate the anesthesiologist labor market to their advantage.[7] *See McLoughlin*, 162 F.4th at 388 (noting that "an antitrust plaintiff must allege . . . that 'the challenged conduct affected the prices, quantity[,] or quality of goods or services, not just [her] own welfare'" (second alteration in original) (citation omitted)); *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (explaining that "an individual plaintiff personally aggrieved by an . . . anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the

---

[7] Plaintiff claims that his experience is "not an isolated incident." SAC ¶ 116; *see also id.* ¶¶ 76, 117–122. But these allegations fail to "raise a reasonable expectation that discovery will reveal evidence" of some larger pattern of anticompetitive conduct by defendants in the relevant market, *Twombly*, 550 U.S. at 556, and are thus insufficient to allege an antitrust injury, *see Reilly*, 578 F. Supp. 3d at 1110 (finding that plaintiff failed to allege a viable antitrust injury because his "theory of harm [was] that his app was rejected from the App Store" and his "theory fail[ed] to connect his supposed injury to [any] injury to competition generally"); *United Energy Trading, LLC v. Pac. Gas & Elec. Co.*, 177 F. Supp. 3d 1183, 1193 (N.D. Cal. 2016) (noting that antitrust injury must flow from conduct that "harms both allocative efficiency and raises the prices of goods above competitive levels" (citation omitted)); *Irish v. Ferguson*, 970 F. Supp. 2d 317, 366 (M.D. Pa. 2013) (finding that plaintiffs failed to allege an antitrust injury where "[t]he objectives of [the allegedly unlawful activity were] all aimed at Plaintiffs, not at influencing a change in the competitive market as a whole"); *cf. Eichorn*, 248 F.3d at 137, 142 (3d Cir. 2001) (finding antitrust injury where defendant's former employees alleged that widespread "no-hire agreements" "represent[ed] an unlawful group boycott in violation of § 1 of the Sherman Act"); *Hunter v. Booz Allen Hamilton, Inc.*, 418 F. Supp. 3d 214, 223 (S.D. Ohio 2019) (finding that plaintiffs "sufficiently alleged an antitrust injury" based on allegations that "no-poach agreements prevented individuals working at one of the Defendants' companies 'from seeking better-paid employment opportunities with other Defendants at JAC Molesworth[,]' and that these no-poach agreements 'eliminated all competition in the market for skilled labor at JAC Molesworth'" (alteration in original)); *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 794 (S.D. Ill. 2018) (same where plaintiff provided detailed factual allegations of "how the no-hire provision led to the employee non-competition agreements and how those agreements harm the labor market for [plaintiff] *and all other current and former Jimmy John's employees*." (emphasis added)).

9

competitive market"). Instead, the SAC dresses up "personal injur[ies] in the guise of . . . antitrust allegation[s]." *Chagares v. Monmouth Med. Ctr.*, No. 21-20677, 2022 WL 3588103, at *5 (D.N.J. Aug. 22, 2022); *Cable Line*, 2017 WL 4685359, at *4 ("The case law in this [C]ircuit is replete with examples where plaintiffs failed to establish an antitrust claim when they have only alleged injury to their own welfare."). As such, the Court will dismiss Plaintiff's antitrust claims against NJHS. *Ethypharm*, 707 F.3d at 233 ("If [antitrust injury] is lacking, [a court] need not address the remaining [antitrust standing] factors.").

### B.    Plaintiff's Fraud Claims (Causes of Action IV–VII)

The Court will dismiss Plaintiff's fraud claims, because Plaintiff has not alleged that he relied on NJHS's alleged misstatements. In New Jersey, the elements of a fraud claim are: "(1) a material misrepresentation of present or past fact; (2) with knowledge of its falsity; (3) with the intention that the other party rely thereon; and (4) which resulted in reasonable reliance by plaintiff." *U.S. Land Res., LP v. JDI Realty LLC*, No. 08-5162, 2010 WL 3218417, at *4 (D.N.J. Aug. 12, 2010) (citation omitted). And in pleading these elements, a plaintiff must satisfy Rule 9(b)'s heightened pleading standard. *Id.*

Plaintiff's fraud claims stem from four alleged misrepresentations. First, he alleges that Dr. Schlesinger "issued the fraudulent Backdated Letter, . . . intentionally backdated the letter[,] and phrased it to appear to have been written a day prior, on May 5, in order to fraudulently predate [Plaintiff's] suspension." SAC ¶ 82. Second, he alleges that defendants made a misrepresentation to the NPDB "when they submitted the fraudulent [CPA] report which contained multiple statements which Defendants knew where false." *Id.* ¶ 88. Third, he alleges that defendants engaged in fraud when "they sent the Backdated Letter to the NPDB in support of the" CPA. *Id.* ¶ 97. And fourth, Plaintiff alleges that defendants made misrepresentations to the DHHS Secretary

10

when they "replied to the Secretary indicating that an investigation had occurred, when they knew that no such investigation existed." *Id.* ¶ 99.

As NJHS correctly points out, Plaintiff does not allege that he was "the intended recipient of the[se] alleged misrepresentations," nor that he "rel[ied] on the alleged misrepresentations." Moving Br. at 29 (citing *Port Liberte Homeowners Ass'n, Inc. v. Sordoni Const. Co.*, 924 A.2d 592, 601 (N.J. 2007) ("[A] plaintiff must prove that he or she was an intended recipient of the defendant's misrepresentations.")). Without these allegations, which speak to Plaintiff's "reasonable reliance" on these alleged misrepresentations, *JDI Realty*, 2010 WL 3218417, at *4 (citation omitted), Plaintiff's fraud claims against NJHS must be dismissed.

### C. Plaintiff's Trade Libel and Intentional Interference with Prospective Business Advantage Claims (Causes of Action VIII & XI)

The Court will dismiss Plaintiff's claims for trade libel and intentional interference with prospective business advantage. To state a claim for trade libel, a plaintiff must allege that defendant made a "(1) publication, (2) with malice, (3) of false allegations concerning [the plaintiff's] property, product[,] or business, and (4) special damages." *Bocobo*, 477 F. App'x at 901 (first alternation in original) (citation omitted). In addition, to state a claim for intentional interference with prospective business advantage, a plaintiff must allege "(1) a 'reasonable expectation of economic advantage' from a business relationship; (2) interference 'done intentionally and with malice,' which means 'the harm was inflicted intentionally and without justification or excuse'; (3) 'the interference caused the loss of the prospective gain'; and (4) damages as a result of the loss." *Bayer Healthcare LLC v. Second Stone Enters. LLC*, No. 24-7618, 2025 WL 1531237, at *9 (D.N.J. May 29, 2025) (citation omitted).

To support these claims, Plaintiff alleges that defendants unlawfully interfered with his future employment activities by submitting the CPA report, SAC ¶¶ 245–49, which he claims

11

contained materially false information, *id.* ¶¶ 10, 21, 30, 36–46.  However, Plaintiff does not plausibly allege that NJHS had any role (let alone any significant role) in the publication of the CPA report.  *See Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 494 n.1 (D.N.J. 2010) (noting, in the context of trade libel, that "publication" means "communication to a third person" (citation omitted)).  Indeed, Plaintiff alleges that HUMC—an entity within the HMH network—filed the CPA report with the NPDB.  ECF No. 43-1, Ex. E; SAC ¶ 6; *see also Fainsbert v. Cuthbert*, No. 06-2017, 2006 WL 2096057, at *7 (D.N.J. July 27, 2006) ("L. Fainsbert has failed to identify any false statement published by the defendants, and her defamation claim cannot proceed.").  And without additional factual detail concerning NJHS's involvement in the CPA report's publication, Plaintiff cannot plausibly allege that NJHS caused the loss of prospective economic gain that Plaintiff alleges in the SAC.  *See Read v. Profeta*, 397 F. Supp. 3d 597, 653 (D.N.J. 2019) (dismissing intentional interference with prospective business advantage claim in part for lack of causation); *see also Jorgensen & Co. v. Sutherland*, No. 15-7373, 2017 WL 1395485, at *7 (D.N.J. Apr. 17, 2017) ("[T]here are no allegations specific to Vono, or any indications of Vono's role in the alleged tortious interference.").  Therefore, the Court will dismiss Plaintiff's claims for trade libel and intentional interference with prospective business advantage against NJHS.

### D.    Plaintiff's Breach of Contract Claim (Cause of Action IX)

The Court will dismiss Plaintiff's breach of contract claim against NJHS, because Plaintiff has not alleged that NJHS was a party to the relevant contract.  "To state a claim for breach of contract, [the plaintiff] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  Plaintiff's

breach of contract claim is premised on his "contractual agreement" with HMH, which incorporates "HMH['s] Bylaws." SAC ¶¶ 219–20; *see also* ECF No. 43-1, Ex. K. However, NJHS is not a party to that contract. Moving Br. at 31–32. As such, the Court will dismiss Plaintiff's breach of contract claim against NJHS. *See Adam Techs. LLC v. Well Shin Tech. Co.*, No. 18-10513, 2020 WL 2125007, at *5 (D.N.J. May 5, 2020) (dismissing breach of contract claim where "Plaintiff [did] not plead that [defendant] was a party to the Agreement").

### E. Plaintiff's Fundamental Fairness and Due Process Claims (Causes of Action X & XIV)

The Court will dismiss Plaintiff's fundamental fairness and due process claims against NJHS, because NJHS is not an entity subject to those provisions. Under New Jersey law, "a physician is entitled to fundamentally fair procedures in a . . . hospital's consideration of staff membership, the extent of privileges[,] and termination." *Hurwitz v. AHS Hosp. Corp.*, 103 A.3d 285, 301 (N.J. Super. Ct. App. Div. 2014) (citation omitted); *see also Nanavati v. Burdette Tomlin Mem'l Hosp.*, 526 A.2d 697, 701 (N.J. 1987). However, NJHS is not a hospital. SAC ¶ 7. Plaintiff also does not plausibly allege that NJHS controls staffing decisions at HUMC or any other medical facility. Therefore, the Court will dismiss Plaintiff's fundamental fairness claim against NJHS.

In addition, "the Due Process Clauses of the Fifth and Fourteenth Amendments . . . prevent [the] *federal and state governments* 'from abusing [their] power, or employing it as an instrument of oppression.'" *Leavitt*, 428 F.3d at 178 (emphasis added) (citation omitted). Accordingly, a due process claim is cognizable only if the plaintiff alleges "state action." *Id.*; *see Borrell*, 870 F.3d at 160. So, Plaintiff's due process claim is cognizable only if he alleges that NJHS participated in state action. *Leavitt*, 428 F.3d at 178; *Borrell*, 870 F.3d at 160 (outlining the "three broad tests" to determine whether private action may constitute state action (citation omitted)). Plaintiff argues that he has sufficiently alleged state action by NJHS, because NJHS "acted in concert with DHHS."

13

Opp'n Br. at 30.  In other words, Plaintiff believes that NJHS's participation in the submission of the CPA report was state action simply because (1) the report was submitted to DHHS under federal reporting requirements, (2) DHHS "published it to [a] data bank," and (3) DHHS relied on it.  *Id.* at 30–31.  The Court disagrees.  To adopt Plaintiff's reasoning would "vitiate the state action requirement in highly regulated industries."  *Taormina v. Suburban Woods Nursing Homes, LLC*, 765 F. Supp. 2d 667, 672 (E.D. Pa. 2011); *see also Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 170, 178–180 (4th Cir. 2009) (finding no state action by hospital where plaintiff's due process claim hinged on the hospital's submission of a report to the NPDB).  Therefore, the Court will dismiss Plaintiff's due process claim against NJHS.

## IV.    CONCLUSION

Accordingly, for the reasons stated above, **IT IS** on this 22nd day of May 2026;

**ORDERED** that NJHS's motion to dismiss (ECF No. 52) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against NJHS in the SAC (ECF No. 43) are **DISMISSED WITHOUT PREJUDICE**; and it is finally

**ORDERED** that Plaintiff shall have thirty (30) days from entry of this Opinion and Order to submit a Third Amended Complaint that addresses the deficiencies identified in this Opinion and Order.  Insofar as Plaintiff chooses to amend, he shall also provide a form of the Third Amended Complaint that indicates in what respect it differs from the SAC, by bracketing or striking through materials to be deleted and underlining materials to be added.  L. Civ. R. 15.1(b)(2).

**SO ORDERED.**

*/s/ Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**

14